2016 IL App (1st) 152370

No. 1-15-2370

Fifth Division
June 24, 2016

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| *In re* MARRIAGE OF | ) | |
| | ) | Appeal from the Circuit Court |
| JUDITH K. STUHR, n/k/a Judith Gloe Keith, | ) | of Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 10 D 1743 |
| | ) | |
| and | ) | The Honorable |
| | ) | Lisa Ruble-Murphy, |
| RICHARD STUHR, | ) | Judge Presiding. |
| | ) | |
| Respondent-Appellant. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

## OPINION

¶ 1    The instant appeal arises from the trial court's entry of a judgment for dissolution of the parties' marriage. Respondent Richard Stuhr appeals the trial court's classification of certain property as marital property, its allocation of assets, and its award of temporary maintenance to petitioner Judith Stuhr. For the reasons that follow, we affirm in part and reverse in part and remand the cause to the trial court for consideration of the appropriate maintenance award.

¶ 2                                    BACKGROUND

¶ 3                               I. Pretrial Proceedings

¶ 4    On February 19, 2010, petitioner filed a petition for dissolution of marriage, alleging irreconcilable differences.[1] According to the petition, petitioner was a 57-year-old clinical psychologist and respondent was a 59-year-old "Disabled Surgeon." The parties had married in 1991 in Alabama and no children were born to or adopted by the parties. As part of the relief requested, petitioner asked for temporary and permanent maintenance from respondent.

¶ 5    On March 26, 2010, petitioner filed a verified petition for temporary maintenance and attorney fees, alleging that respondent was living at the former marital residence and petitioner was living at a different address. Petitioner claimed that she was employed as a psychologist at Rush University Medical Center and earned a net monthly income of approximately $4908, while respondent had been a surgeon and was now receiving a tax-free disability income of approximately $20,932.38 per month; she further claimed that the parties had "considerable marital assets," including investment and retirement accounts. Petitioner claimed that she had monthly expenses of approximately $10,949 per month, which reflected the standard of living she enjoyed with respondent, and that she lacked sufficient assets and income to provide for her maintenance and support without substantial contributions from respondent. Accordingly, petitioner sought temporary maintenance from respondent, as well as an order for respondent to pay petitioner's attorney fees. As an exhibit to her petition for temporary maintenance, petitioner attached a disclosure statement pursuant to circuit court of Cook County rule 13.3.1 (13.3.1 disclosure statement) (Cook Co. Cir. Ct. R. 13.3.1 (Jan. 1,

_____

[1]A motion for consolidation in the record on appeal indicates that respondent had also filed a petition for dissolution of marriage, with his petition being filed on February 22, 2010. That petition does not appear in the record on appeal, but the two actions were consolidated on March 4, 2010.

2003)), itemizing her assets and expenses as of March 19, 2010. In September 2010, the trial court entered an agreed order awarding petitioner $5600 per month in temporary maintenance from respondent, with the issue of any retroactive maintenance reserved for trial; the amount of temporary maintenance was increased to $8600 per month in November 2011.

¶ 6     On January 25, 2012, respondent filed a "Notice of [a] Claim of Dissipation," in which he claimed that petitioner had expended large sums of money by way of contributions to what respondent characterized as a "Muslim sect or cult" known as Sufism, which respondent claimed constituted dissipation.

¶ 7     On April 27, 2012, petitioner filed a motion for summary judgment, seeking, *inter alia*, a designation of the payments that respondent received for disability as marital property. On May 16, 2012, respondent filed a motion for partial summary judgment, seeking the entry of an order finding that six financial accounts that were titled in his name were respondent's nonmarital property. On June 11, 2012, respondent filed a cross-motion for partial summary judgment concerning his disability policies, seeking an order finding that the payments under those policies were nonmarital income. On May 13, 2013, the trial court granted partial summary judgment in respondent's favor, finding that the payments under the disability insurance policies constituted income and not property.[2]

¶ 8                                      II. Trial

¶ 9     Trial commenced on June 9, 2014, and proceeded over five days. A total of four witnesses testified at trial: petitioner; respondent; John Cook, respondent's stockbroker; and

---

[2]Although respondent's motion for summary judgment sought a finding that the income was nonmarital income, the trial court's order did not discuss whether such income would be considered marital or nonmarital.

Jeffrey Newman, an expert witness who testified on petitioner's behalf concerning how much income petitioner would require to maintain her current lifestyle. While the witness testimony was extensive, we relate here only that testimony that relates to the issues on appeal.

¶ 10                                                     A. Petitioner

¶ 11        Petitioner testified that she was currently living in Atlanta, Georgia, where she moved in December 2013, and was currently employed part-time at the Atlanta VA Medical Center as a clinical psychologist with a specialty in sleep medicine. She testified that she held bachelor's degrees in nursing and anesthesia, as well as a master's degree in psychology and a Ph.D. in clinical psychology; she had obtained all of her degrees, other than the bachelor's degrees, while married to respondent. Petitioner had also obtained a master's degree in divinity since the filing of the petition for dissolution of marriage, which she received from the University of Spiritual Healing and Sufism in 2013.

¶ 12        Petitioner testified that at the time of her 1991 marriage to respondent, she was employed as a certified registered nurse anesthetist in Tuscaloosa, Alabama. In 1995, she decided to switch careers, with respondent's support, and enrolled in graduate school for her master's in psychology. Her clinical internship for her graduate program in psychology was at Rush University Medical Center (Rush), which was the reason she and respondent moved to Chicago. After the internship, she also completed her fellowship at Rush and then opened a private practice in Chicago, where she worked for five years while also being an "affiliated scientist and an independent contractor with Rush University Medical Center specifically for their med peds program." Petitioner explained that her divinity degree was relevant to her work as a psychologist because "in the last twenty years, psychologists also include the

spiritual aspects of our clients," so petitioner took a number of courses integrating spirituality with psychology. She testified that through her private practice, she "realized that a lot of the techniques and theories that I learned in graduate school didn't help some folks. Some people, the bottom line, their depression, their anxiety, the problems they were having, were more of a spiritual nature."

¶ 13    In December 2008, petitioner and her business partner began winding down their private practice and petitioner accepted a part-time job at Rush in gero-rehab psychology. In July 2009, she began working full-time at Rush for approximately $80,000 a year, which continued until 2010 or 2011, when her hours were cut by 25% due to a contraction of operations at Rush. In March 2013, petitioner accepted a job at the Birmingham VA Medical Center to work in telemental health; petitioner explained that she "was hired to work over video, TV screen, to see veterans in Augusta, Georgia, for depression, anxiety, PTSD, and individual psychotherapy." She testified that she decided to leave Chicago and move south so that she could be closer to her children,[3] one of whom lived in Memphis, Tennessee, one of whom lived in Atlanta, Georgia, and one of whom attended Auburn University; Petitioner explained that "Birmingham kind of seemed like a central location to be near them all." Her salary was approximately $95,000, and she was satisfied with the job, but not with living in Birmingham, which she felt she had "outgrown" after living in Chicago for 11 years.

¶ 14    Petitioner testified that she applied for, and received an offer for, a part-time sleep medicine/behavioral health position in the VA in Atlanta, so she moved to Atlanta in December 2013; she testified that her practice had never been limited to that discipline prior to the job in Atlanta but that her focus of health psychology did include sleep medicine. She

---

[3]Petitioner had three children from a previous marriage.

testified that she wanted to move to Atlanta because she was looking for a larger city and one of her sons was moving to Atlanta, so she would have two children in the city and it "just seemed like the perfect place to move." Petitioner testified that she was currently satisfied in this position, but that if she was offered a full-time position in Atlanta in the field of sleep medicine, she would accept it. Her current salary was slightly over $50,000, and if her position was full-time, it would be approximately $100,000 a year. She testified that when she was looking for employment in Atlanta, she was looking for a full-time position and believed that her current position was full-time until her job interview, when she was informed that the hospital was hiring two part-time sleep psychologists and not one full-time one; she further testified that there was no full-time position available. Petitioner testified that there was "[v]ery much" a chance that she would be offered a full-time position, since the sleep medicine department had expanded and was moving to a new building. She testified that she was not currently looking for a full-time position because she was "satisfied with where I am" and "[s]leep medicine has always been my dream job."

¶ 15     Petitioner testified that she was a member of the Sufi religion, which was a mystical branch of Islam. She converted to Sufism in the fall of 2007, while still living with respondent, and also converted to the Muslim faith in the summer of 2008.[4] Petitioner testified that she donated to Sufism while married to respondent and deducted her donations on her tax returns with respondent. Petitioner further testified that respondent never objected to her making donations to Sufism and that she participated in Sufi seminars and retreats while she was living with respondent. Petitioner testified that she donated approximately

_____

[4]Petitioner testified that these were two separate conversions and that "[y]ou can be Sufi without being a Muslim."

6

$600 a month to Sufism when she could afford it, $400 of which was "Zakat," which was similar to tithing.

¶ 16                                    B. Respondent

¶ 17        Respondent testified that he currently resided in the marital residence, where he had lived alone since petitioner left in February 2010. He testified that he was currently 63 years old and had been a surgeon until he retired in 2000 due to a knee injury that he had sustained in 1995; he earned approximately $300,000 a year as a surgeon. When he retired, he began receiving payments from disability insurance policies that he had purchased, which were approximately $25,500 gross per month; the payments were tax-free and would continue for the duration of his lifetime. Respondent testified that he paid the premiums on his disability policies from 1995 until he retired; prior to 1995, the premiums had been paid by a professional corporation in which he was a partner. After 1995, he paid his premiums from his joint account with petitioner.

¶ 18        Respondent testified that he had been previously divorced prior to his marriage to petitioner, and the divorce decree[5] from his prior marriage had been entered early in the same year as his marriage to petitioner. Respondent testified that the divorce decree split certain assets as follows: a "Surgical Associates of Tuscaloosa, P.C. Money Purchase Pension Plan" was equally divided between respondent and his ex-wife; Merrill Lynch IRA 0511[6] was awarded to respondent; and Merrill Lynch "Cash Management Account" 5739 was awarded to respondent. The divorce decree also awarded respondent his full ownership interest in

---

[5]We note that, while in Illinois, a court enters a "judgment of dissolution of marriage" (750 ILCS 5/401(a) (West 2008)), in Alabama, where respondent's first marriage ended, the court enters a "judgment of divorce" (Ala. Code § 30-2-1(b) (2008)). Accordingly, when discussing respondent's first marriage, we refer to a "divorce" and not a "dissolution."

[6]With respect to bank and investment accounts, we refer to the account by the name of the bank or brokerage firm and the last four digits of the account.

several medical enterprises, namely, Surgical Associates of Tuscaloosa, P.C.; West Alabama Physician's Answering Service, Inc.; the Answering Service, Ltd.; Tuscaloosa Surgical Center, Inc.; Tuscaloosa Surgical Center, Ltd.; Tuscaloosa Surgical Center Partnership; and Southern Medical Testing Service, Inc. Respondent admitted that the divorce decree did not include any specific valuation for any of the assets divided between respondent and his first wife. Respondent further testified that he did not enter into a premarital agreement prior to marrying petitioner because his attorney advised him that one would be unnecessary as long as he kept his marital and nonmarital assets separate and that respondent followed that advice.

¶ 19    Respondent testified his stockbroker for over 20 years had been John Cook and he had begun working with Cook in 1991, approximately at the time of his first divorce. At that point, Cook was a broker with J.C. Bradford, Inc., where he remained until the company was purchased by PaineWebber approximately in 2000. After that, Cook moved from PaineWebber to Morgan Keegan, another brokerage firm, which was bought out by Raymond James. At the time of the divorce, respondent owned several accounts at Merrill Lynch, which he transferred to Cook at J.C. Bradford.

¶ 20    Respondent testified that while there was documentation about the accounts at Morgan Keegan in 2001, followed by Raymond James, there was no documentation of any of the accounts from his 1991 divorce until the opening of the Morgan Keegan accounts in 2001 because "[t]hey don't exist." He testified that there would have been monthly brokerage statements from J.C. Bradford and PaineWebber, but he did not have them and was unable to obtain them because he was told by PaineWebber that such records had "been destroyed."

¶ 21 However, respondent testified that he had created "essentially a spreadsheet that I downloaded from my Microsoft Money program on my home computer in which I keep all transactions in all accounts. So what I did was I downloaded this to Quicken as a spreadsheet and printed it out showing what transactions were made in terms of cash flow in my old J.C. Bradford account[s] starting from the early '90s, I think '93 or '4, when I first obtained a computer." On cross-examination, respondent was questioned about the information contained in the spreadsheet, and testified that "[s]ome of it" was information that he had manually input from brokerage statements that he had received, "some of it is just my memory," and some was input through electronic downloads from the brokerage firm.

¶ 22 With respect to certain of his assets, respondent testified that he had been a partner in a practice called Surgical Associates of Tuscaloosa; he was a partner from his second year in practice until 1998, when the practice merged with another practice and was renamed Surgical Specialists of Alabama, PC, and respondent remained a partner in the new practice until he retired in 2000. During his marriage to petitioner, respondent made contributions through his medical practice to a money purchase pension plan with J.C. Bradford, which was later designated a 401(k) plan; the practice made annual $30,000 contributions to this plan until respondent retired. Respondent testified concerning an exhibit containing 401(k) documents for this plan, the earliest of which showed that the account balance as of November 1, 1996, was $38,097.13; respondent testified that there were no records in existence covering the time period from his divorce until that earliest statement. Respondent further testified that the exhibit showed an account balance of $956,865.82 as of December 31, 2001. "[A] year or so after [he] retired," respondent placed these funds in a rollover IRA with Morgan Keegan (Morgan Keegan IRA 4134), which was opened in 2001 with an

opening balance of "something under a million dollars." As of January 4, 2012, the Morgan Keegan account had an account value of $987,814.15. This account was later transferred to Raymond James IRA 2427, which had a balance of $1,374,176 as of March 31, 2014.

¶ 23    With respect to Raymond James account 6117, respondent testified it was the same account as Merrill Lynch account 5739, which he had been awarded in his prior divorce. Respondent testified that the funds in this account came directly from the funds from Merrill Lynch account 5739, which were transferred to J.C. Bradford and then to PaineWebber. The funds were then transferred to Morgan Keegan account 7465 from 2001 through 2011, and then became Raymond James account 6117. Again, respondent testified that he had no documentation of the accounts between his 1991 divorce and the opening of the Morgan Keegan account in 2001 because such documentation was no longer in existence. According to his self-created spreadsheet, the account had a "running balance" of -$101,614.84 as of September 24, 1991. Respondent testified to an exhibit that contained account statements from Morgan Keegan account 7465, and testified that the first year's statement showed a zero opening balance and a "Market Value of Priced Assets" of $2,108,452.47 as of December 31, 2001. Respondent further testified that there were also some funds in the account that had been deposited into the account from "outside" sources. The largest was his portion of the buyout of Tuscaloosa Surgical Center, which had been awarded to respondent in his first divorce, by HealthSouth Corporation, which was in the amount of $279,227.12. He also made several deposits from his and petitioner's joint account into the account, as well as $66,000 he received from selling his share of an outpatient surgical center to another physician. According to the parties' joint exhibit of marital assets, this account had a value of $4,060,606 as of March 2014.

¶ 24    With respect to Raymond James IRA 2516, respondent testified that Merrill Lynch IRA 0511, which he had been awarded in his prior divorce, was the same funds as Morgan Keegan IRA 4142, which later became Raymond James IRA 2516. Respondent testified that several pages of his self-created spreadsheet concerned this account; according to the spreadsheet, the opening balance of the account was $339.60 in September 1991 and the balance as of January 2000 was $1805.02;[7] respondent testified that there were no "documents that trace this account from [his] divorce in '91 to the opening of the Morgan Keegan account in 2001." He further testified that an additional exhibit showed the transfer of the account from PaineWebber into Morgan Keegan in 2001; this exhibit consisted of account statements from Morgan Keegan and the first account statement showed that as of February 28, 2001, the balance in the account was $54,738.72. He testified that there were three years in which he transferred money from the Morgan Keegan account 7465 (which became Raymond James account 6117) and into the IRA. According to the parties' joint exhibit of marital assets, this account had a value of $121,637 as of March 2014.

¶ 25    With respect to Bank of Cashton account 6879, respondent testified that this account was a health savings account that respondent established in 2005 or 2006 when he had a high-deductible insurance plan. Respondent testified that every month, he would withdraw a check from Morgan Keegan account 7465 (which became Raymond James account 6117) and deposit it into the account. According to the parties' joint exhibit of marital assets, this account had a value of $40,111 as of March 2014.

---

[7]We note that respondent's testimony concerning this portion of the spreadsheet indicated that he was confused about it, with him testifying that "I can't really say [what account the exhibit concerned] because it says on the cover sheet that this is the IRA which was transferred to J.C. Bradford, but some of the transactions at later dates were not in the IRA, so I don't know what it is" and also testifying that the exhibit "doesn't look familiar to me" but that "I must have [created the document in the exhibit] because I have the records on my computer."

¶ 26       With respect to Citibank account 0067, respondent testified that this was a checking and savings account[8] that was primarily funded by his disability payments. Some funds from this account also came from the closing of a VP Bank savings account, which was a foreign bank that "didn't want to deal with Americans anymore" and returned the balance of his account, which he then deposited into the Citibank account. Respondent testified that the VP Bank account had been funded with funds from Merrill Lynch account 5739, which later became Raymond James account 6117. According to the parties' joint exhibit of marital assets, this account had a value of $119,333 as of March 2014.

¶ 27       With respect to Capital One account 7666, respondent testified that this was a savings account that contained distributions from Raymond James IRA 2427 and no other funds. According to the parties' joint exhibit of marital assets, this account had a value of $126,083 as of March 2014.

¶ 28       Respondent also testified that shortly after petitioner left in 2010, he prepared a list of items that she had taken, including photo albums, furnishings, clothing, and her automobile. On cross-examination, respondent testified that some of the values that were listed for the particular items were not supported by appraisals.

¶ 29       Respondent testified that he had made payments on the marital residence since 2010, including monthly payments to the mortgage company and monthly assessments to the condominium association. He made the payments using his Citibank accounts, and the source of the funds in those accounts was his monthly disability payments.

---

[8]The parties' joint exhibit of their marital assets states that there are two accounts, "Citi checking No. 0067" and "Citi Savings No. 0067," but respondent refers to it as one account. The value we list for the account is a combination of the values for both accounts listed in the joint exhibit.

¶ 30                                        C. John Cook

¶ 31        John Cook testified that he was a stockbroker with Raymond James, which had acquired his former firm, Morgan Keegan, at the beginning of 2013. Cook had worked at Morgan Keegan since 2001. Prior to that, he had worked for 20 years at J.C. Bradford & Company, which was acquired by PaineWebber, prompting Cook's move to Morgan Keegan. Cook met respondent in 1990 and characterized him as a "long-term friend of mine and a client of mine." Respondent became Cook's client in 1991.

¶ 32        Cook testified that respondent's approach to investing was "buy and hold long-term," meaning that he held stocks for 10 or more years. Cook characterized respondent as a "very astute" and knowledgeable investor. Cook testified consistently with respondent's testimony about the sources of the funds in respondent's various accounts.

¶ 33        Cook testified that there was no documentation on the accounts from the time he was at Bradford because the firm no longer existed; the earliest documents were those from Morgan Keegan beginning in 2001. However, Cook was able to remember the facts concerning the transfers of each of the accounts because "I did them. I was there." Cook did not have any written notes of what he did, but testified that "it's no problem for me to remember it at all" because "I do this 24/7, this job. It's something that's in my brain all the time." Cook testified that since his community in Alabama was smaller, "[i]t's just so much more personal and hands-on, it's just easy to remember all of this stuff."

¶ 34        On cross-examination, Cook testified that when he began working with respondent at J.C. Bradford, he had approximately 200 other clients.

¶ 35                                     D. Jeffrey Newman

¶ 36        Jeffrey Newman testified on petitioner's behalf as an expert witness concerning projections of respondent's and petitioner's future assets and income, and testified as to how much income petitioner would require to maintain her lifestyle.

¶ 37                                    E. Trial Court Judgment

¶ 38        On July 23, 2015, the trial court entered a judgment for dissolution of the parties' marriage. In the judgment, as to maintenance, the trial court found that the evidence established that petitioner was in need of maintenance from respondent in order to support herself at the standard of living enjoyed by the parties during the marriage, that respondent maintained the financial ability to pay maintenance, and that petitioner was not intentionally underemployed. The trial court then examined: (1) petitioner's age, health, income, earning capacity, and impairment; (2) respondent's income and property; (3) petitioner's needs; (4) the duration of the marriage and standard of living; (5) the property of the parties; (6) the tax consequences of the property division; and (7) any agreement between the parties. After considering these factors, the court found that it was appropriate for respondent to pay petitioner reviewable maintenance in the amount of $8600 per month, with the maintenance obligation subject to review five years after the date of the judgment for dissolution of marriage.

¶ 39        As to the six accounts that respondent maintained were nonmarital assets, the trial court found that all six accounts would be classified as marital property. With respect to Raymond James account 2427, the court found that other than his testimony, respondent did not present any evidence tracing the source of the funds and that, "[a]fter a careful review of the evidence, *** [respondent] failed to meet his burden of clear and convincing evidence as to

14

the non-marital source of the funds in [Raymond James account 2427 (RJ 2427)]." The court found:

> "First, [respondent] failed to provide any clear or convincing evidence tracing the non-marital source of the other funds in RJ 2427. There is no evidence regarding the value of [the] purchase pension plan at the time of [respondent's] First Divorce Decree. There is no evidence regarding the value of the purchase pension plan at the time of [respondent's] marriage to [petitioner]. [Respondent] did not even testify as to his estimate of the value of the purchase pension plan at the time of his marriage to [petitioner]. Second, [respondent] testified that a portion of the funds in RJ 2427 were pension contributions based upon his earnings during his marriage to [petitioner] and obviously marital property. So even if [respondent] had presented clear and convincing evidence tracing the non-marital source of some of the funds in the account, there is no evidence upon which the Court could rely to differentiate which funds in RJ 2427 are marital and which are non-marital. The case law is clear that it is [respondent's] burden to present clear and convincing evidence to support his claim that these funds, or at a minimum a portion of the funds, constitute non-marital property. [Citation.] It is not appropriate for the Court to accept blindly [respondent's] self-serving and unsubstantiated testimony. Accordingly, the Court classifies RJ 2427 as marital property."

¶ 40     With respect to Raymond James account 6117, the court similarly found that other than his testimony, respondent did not provide any evidence tracing the source of finds used to establish the account and, accordingly, failed to meet his burden of clear and convincing evidence as to the nonmarital source of the funds in that account. The court noted that there

15

was no evidence regarding the value of the account at the time of the first divorce decree, nor was there any evidence regarding the value of the account at the time of respondent's marriage to petitioner; "[t]he only evidence presented to the Court is the value of the Morgan Keegan Account 7465 in January, 2001, at a time after the parties had been married for almost 10 years, and the activity in the account from the date of its establishment." The court rejected evidence of respondent's personal recordkeeping:

"[Respondent] presented evidence regarding some of his personal recordkeeping [citations]. [Respondent] testified that he created these spreadsheets 'probably four years ago' in Microsoft Money and transferred the records to Quicken Spreadsheets in order to print out the records [citation]. [Respondent] also testified that he first purchased a computer in 1993 or 1994 [citation]. So, although these spreadsheets include transactions dated from 1991 through 2001, [respondent] could not have entered the transactions until 1993 or thereafter. During the trial, [respondent's] testimony was very unclear about his familiarity with the information contained in these spreadsheets [citation]. These spreadsheets do not identify the account to which the transactions apply. Rather, the identification purportedly linking the transactions to the accounts is a cover sheet to the Tab in which the spreadsheet is located when the spreadsheets were introduced into evidence at trial. However, even assuming that [respondent's] testimony and the evidence were clear, the fact remains that *these spreadsheets do not trace the source of the funds* used to establish Morgan Keegan Account 7465, or any other account for that matter, and do not indicate the balance in any account prior to the date the parties were married. Therefore, the Court does not

ascribe any weight to the information contained in these spreadsheets." (Emphasis in original.)

Again, the court found that "[i]t is not appropriate for the Court to accept blindly [respondent's] self-serving and unsubstantiated testimony" and found the account to be marital property.

¶ 41    With respect to Raymond James account 2516, the trial court similarly found that respondent had failed to provide clear and convincing evidence tracing the nonmarital source of funds in the account, pointing to the fact that there was no evidence regarding the value of the account at the time of the first divorce decree and no evidence regarding the value of the account at the time of respondent's marriage to petitioner. The court noted that "[respondent] did not even testify as to his estimate of the value of the IRA at the time of his marriage to [petitioner]." Again, the court indicated that it was "not appropriate for the Court to accept blindly [respondent's] self-serving and unsubstantiated testimony." Accordingly, the court found the account to be marital property.

¶ 42    With respect to Cashton account 6879 and Capital One account 7666, the court found that these accounts were marital property because the only source of funding for those accounts were accounts that the court had determined were marital property. For both accounts, the court found that "the fact that this account is titled only in [respondent's] name [is] irrelevant for purposes of classifying this asset." The court reached the same conclusion with respect to Citibank account 0067, finding that the deposits into the account were from an account that the court had determined was marital property and from respondent's disability income, which was also marital.

17

¶ 43    The court then assigned all nonmarital property and allocated the parties' marital property, awarding petitioner $472,219.70 in accounts in which petitioner had a 100% interest; a 50% interest in the six disputed accounts at issue on appeal, which had a combined value of $6,562,316.87 as of the end of November 2014; and "all the furniture, furnishings, automobiles, clothes, personal items and jewelry currently in her possession." Respondent was awarded the marital residence, with a stipulated value of $527,000 and net equity of $492,000; "all the furniture, furnishings, automobiles, clothing, jewelry and personal items in his possession"; a 100% interest in his disability income; a 50% interest in the six disputed accounts at issue on appeal; and a 100% interest in a nonmarital investment account with a value of $8,249,106.11 as of the end of November 2014.

¶ 44    The court denied respondent's request for reimbursement of the funds that respondent had expended in maintaining the marital residence during the pendency of the case, noting that respondent alone had been residing in the residence since petitioner left it in February 2010 and the parties agreed that respondent would be awarded the marital residence in connection with the judgment.

¶ 45    Finally, the court denied respondent's request for a finding of dissipation as to petitioner's contributions to the Sufi religion, finding that, "[f]irst, prior to the breakdown of the parties' marriage, the parties made donations to the Sufi religion and, therefore, [petitioner's] contributions to the Sufi religion constitute an extension of patterns of practice established during the marriage. Second, the Court declines to characterize the Sufi religion as a 'cult' as argued by [respondent] and finds that it is not dissipation for [petitioner] to support charitable and religious activities that she determines to be appropriate."

¶ 46                                                    ANALYSIS

¶ 47          On appeal, respondent argues that the trial court erred in (1) classifying six accounts titled in his name as marital property; (2) not ordering reimbursement for expenses respondent paid for the marital residence; (3) finding no dissipation in petitioner's contributions to Sufism; (4) omitting the value of personal property awarded to petitioner when dividing the marital estate; and (5) awarding petitioner maintenance or, alternatively, not basing the maintenance award on petitioner's "actual needs for a limited and finite period of time." We consider each argument in turn.

¶ 48                          I. Classification of Accounts as Marital Property

¶ 49          First, respondent argues that the trial court erred in classifying the following six accounts as marital property instead of nonmarital: (1) Raymond James account 6117, worth $4,060,606; (2) Raymond James IRA 2516, worth $121,637; (3) Raymond James IRA 2427, worth $1,374,176; (4) Cashton account 6879, worth $40,111; (5) Citibank account 0067, worth $117,848; and (6) Capital One account 7666, worth $126,083. The disposition of property is governed by section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 2008)). *In re Marriage of Lundahl*, 396 Ill. App. 3d 495, 502 (2009). "Before a court may distribute property upon the dissolution of a marriage, it must first classify the property as either marital or nonmarital." *In re Marriage of Faber*, 2016 IL App (2d) 131083, ¶ 3. Generally, the trial court's classification of an asset as marital or nonmarital will not be disturbed unless it is contrary to the manifest weight of the evidence. *In re Marriage of Wendt*, 2013 IL App (1st) 123261, ¶ 15. "[A] decision is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or when the court's findings appear to be unreasonable, arbitrary, or not based upon the

evidence." *Faber*, 2016 IL App (2d) 131083, ¶ 3 (citing *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44).

¶ 50    Section 503(a) of the Act defines nonmarital property as:

"(1) property acquired by gift, legacy or descent;

\* \* \*

(6) property acquired before the marriage;

(7) the increase in value of property acquired by a method listed in paragraphs (1) through (6) of this subsection, irrespective of whether the increase results from a contribution of marital property, non-marital property, the personal effort of a spouse, or otherwise, subject to the right of reimbursement provided in subsection (c) of this Section; and

(8) income from property acquired by a method listed in paragraphs (1) through (7) of this subsection if the income is not attributable to the personal effort of a spouse." 750 ILCS 5/503(a) (West 2008).

Respondent argues that all six of the accounts at issue should have been classified as nonmarital property and that the trial court erred in finding that it was marital property. We do not find this argument persuasive.

¶ 51    Under section 503 of the Act, "all property acquired by either spouse after the marriage and before a judgment of dissolution of marriage or declaration of invalidity of marriage, including non-marital property transferred into some form of co-ownership between the spouses, is presumed to be marital property, regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, or community property." 750 ILCS 5/503(b)(1) (West 2008). Such a

presumption may be overcome by showing that the property was acquired by a method listed in section 503(a). 750 ILCS 5/503(b)(1) (West 2008). The party claiming that the property is nonmarital has the burden of rebutting the presumption by clear and convincing evidence, and any doubts as to the classification of property will be resolved in favor of finding that the property is marital property. *In re Marriage of Dhillon*, 2014 IL App (3d) 130653, ¶ 24.

¶ 52    "Tracing of funds is a procedure which allows the court to find that property which would otherwise fall within the definition of marital property is actually nonmarital property under one of the statutory exceptions." *In re Marriage of Jelinek*, 244 Ill. App. 3d 496, 504 (1993) (citing *In re Marriage of Scott*, 85 Ill. App. 3d 773, 777 (1980)). " 'Tracing requires that the source of the funds be identified.' " *In re Marriage of Demar*, 385 Ill. App. 3d 837, 851 (2008) (quoting *In re Marriage of Davis*, 215 Ill. App. 3d 763, 770 (1991)).

¶ 53    In the case at bar, all six accounts were opened during the marriage and, therefore, the marital presumption applies to the accounts. See *Dhillon*, 2014 IL App (3d) 130653, ¶ 25 ("because account 4863 was opened during the marriage, the marital presumption clearly applied to the account and to the funds therein"). However, respondent claims that he properly traced the source of the funds in the six accounts through his testimony and the testimony of Cook, his financial advisor, and that this testimony was sufficient to prove by clear and convincing evidence that the source of the funds in the accounts was nonmarital. We do not find this argument persuasive.

¶ 54    With respect to the three Raymond James accounts, the trial court found that respondent had failed to establish by clear and convincing evidence that the funds were nonmarital property, primarily because (1) there was no record establishing the value of the accounts at the time of his prior divorce in 1991 or at the time of his marriage to petitioner later in 1991

and (2) there were no records concerning the accounts until they were transferred to Morgan Keegan in 2001. We cannot find that this conclusion was against the manifest weight of the evidence.

¶ 55    In the case at bar, the sole evidence as to any of the Raymond James accounts prior to 2001 came from respondent's and Cook's testimonies. Respondent claims that these testimonies were sufficient to trace the accounts to a nonmarital source and that no further documentation was necessary. Respondent is correct that a party's testimony may be sufficient to trace whether marital funds were contributed to nonmarital property. See, *e.g.*, *In re Marriage of Henke*, 313 Ill. App. 3d 159, 174 (2000) (finding that the trial court had properly classified a certain amount of property as marital where the wife's testimony concerning contributions "was sufficient to trace the contributions of the marital estate to the nonmarital property by clear and convincing evidence"). However, "[w]itness credibility and the resolution of conflicts in evidence are matters within the discretion of the trial judge and should not be disturbed upon review." *Moniuszko v. Moniuszko*, 238 Ill. App. 3d 523, 530 (1992). Indeed, "[e]ven uncontradicted testimony, if inherently unreasonable or improbable, need not be believed." *In re Marriage of Pittman*, 212 Ill. App. 3d 99, 103 (1991) (citing *In re Marriage of Hilkovitch*, 124 Ill. App. 3d 401, 415 (1984)).

¶ 56    Respondent claims that the trial court did not make any findings as to his credibility and that his credibility and Cook's credibility were "never questioned by the circuit court." However, in the judgment for dissolution of marriage, the trial court expressly noted that it would not "accept blindly [respondent's] self-serving and unsubstantiated testimony" concerning the source of funds in the accounts. Thus, the trial court did make several comments indicating its view of respondent's testimony. We will not second-guess the trial

22

court's decision not to "accept blindly" respondent's testimony, especially in light of the trial court's presence during respondent's lengthy trial testimony.

¶ 57    Respondent also argues multiple times in his brief that "[petitioner] offered no testimony or other evidence to contradict [respondent's] evidence regarding the funding of [the] account[s]" and that "[w]ith no evidence to the contrary," he showed the nonmarital origins of the accounts. However, as noted, in order to rebut the presumption that the property was marital, respondent had the burden of proving that the source of funds was nonmarital by clear and convincing evidence. See *Dhillon*, 2014 IL App (3d) 130653, ¶ 25. Petitioner had no obligation to present any evidence or to contradict respondent's evidence. See *In re Marriage of Didier*, 318 Ill. App. 3d 253, 265 (2000) ("Although Martin offered no evidence to dispute Gail's assertion that the accounts were her nonmarital property, *it was not his burden to do so*." (Emphasis in original.)). In the case at bar, the trial court was clearly troubled by the fact that there was no evidence apart from respondent's and Cook's testimonies that provided any information about the funds in the Raymond James accounts until the creation of the Morgan Keegan accounts in 2001. Therefore, in light of the presumption in favor of finding property to be marital, we cannot find that the trial court's conclusion that the Raymond James accounts were marital property to be against the manifest weight of the evidence. See *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 702 (2006) (noting that where no documentary evidence of a loan was presented and there was no other evidence that the loan had been repaid, "the existence and repayment of the 'loan' hinges on the circuit court's determination of [the husband's] credibility" and finding that the court was "entitled to conclude that the loan was made but never repaid, because [the husband] has failed to present any evidence of either, apart from his testimony"). Indeed, we

note that it would be reversible error for a court to *not* find the property to be marital in light of a lack of evidence tracing the source of funds. See *Dhillon*, 2014 IL App (3d) 130653, ¶ 25 (finding reversible error where, "[f]aced with a lack of evidence to determine where the funds in account 4863 had come from, the trial court made an assumption that it could not have come from the marriage and had to have come from husband's father" and noting that "[t]he trial court should have found instead that because it had not been proven where the funds in account 4863 had come from, husband, as the party with the burden of proof, had failed in that burden, and that the funds, therefore, were deemed to be marital property").

¶ 58    With respect to Cashton account 6879, Capital One account 7666, and Citibank account 0067, the court found that these accounts were marital property because the only source of funding for those accounts were accounts that the court had determined were marital property, namely, the Raymond James accounts.[9] As we have just concluded, the trial court's determination that those accounts were marital property was not against the manifest weight of the evidence. Accordingly, it was also not against the manifest weight of the evidence for the court to conclude that the accounts funded by those Raymond James accounts were also marital property.

¶ 59    Therefore, since the trial court's classification of these six accounts as marital property was not against the manifest weight of the evidence, we affirm the trial court's judgment on this issue.

---

[9]With respect to the Citibank account, the court also found that it was funded through respondent's disability income, which it concluded was marital. However, even if the disability income was nonmarital, the presence of marital funds via the Raymond James account would render this account marital.

¶ 60                                    II. Reimbursement

¶ 61         Respondent's next argument on appeal is that he is entitled to the reimbursement of the funds that he spent on the marital residence after petitioner moved out. "Section 503(c) of the Act provides, under certain circumstances, for reimbursement to the nonmarital estate of a spouse for contributions made to the marital estate. [Citation.] For reimbursement to be required, the contribution must be traceable by clear and convincing evidence and must not have been intended as a gift to the marital estate." *Dhillon*, 2014 IL App (3d) 130653, ¶ 46. "A trial court's determination that one estate of property is entitled to reimbursement from another will not be reversed unless it is against the manifest weight of the evidence." *In re Marriage of Ford*, 377 Ill. App. 3d 181, 185-86 (2007). As noted, "[a] finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is arbitrary, unreasonable, or not based upon the evidence presented." *Dhillon*, 2014 IL App (3d) 130653, ¶ 29. The burden of proof to establish that reimbursement is appropriate is on the party seeking reimbursement. *Dhillon*, 2014 IL App (3d) 130653, ¶ 46.

¶ 62         In the case at bar, respondent argues that he is entitled to be reimbursed for the mortgage payments and association fees he paid on the marital residence because he made those payments from his disability income, which he claims is nonmarital income. The trial court denied respondent's request for reimbursement of the funds that respondent had expended in maintaining the marital residence during the pendency of the case, noting that respondent alone had been residing in the residence since petitioner left it in February 2010 and the parties agreed that respondent would be awarded the marital residence in connection with the judgment. We cannot find this decision to be against the manifest weight of the evidence.

¶ 63　　　　In the context of a marital estate contributing to the upkeep of nonmarital real property, our supreme court has noted with approval that "Illinois courts have previously held that a marital estate is not entitled to reimbursement for mortgage payments toward nonmarital property when the marital estate has already been compensated for its contributions by use of the property during marriage." *In re Marriage of Crook*, 211 Ill. 2d 437, 454 (2004) (finding that the trial court abused its discretion in ordering reimbursement because the marital estate had reaped the benefits of the wife's nonmarital contributions). See also *Ford*, 377 Ill. App. 3d at 187 (vacating trial court's order of reimbursement and finding that "the benefit of the use of the Port Barrington property fully compensated the marital estate for its contribution and that the marital estate is not entitled to reimbursement"); *In re Marriage of Snow*, 277 Ill. App. 3d 642, 650 (1996) ("Here, the parties lived in petitioner's nonmarital residence for at least 10 years during the marriage. Accordingly, because the parties benefited from living in the house for a substantial period of time, the court could reasonably have found that the marital estate had already been compensated for its contributions.) Similarly, in the case at bar, respondent continued to live in the marital residence from the time petitioner left in 2010 through the time of the entry of the judgment for dissolution in 2015, and the parties agreed that respondent would be awarded the property. Thus, respondent received the benefit of living in the marital residence for at least five years after petitioner left the residence. Accordingly, we cannot find that it was against the manifest weight of the evidence for the trial court to conclude that respondent had been sufficiently compensated for his payments of the mortgage and association fees through his use of the marital home and affirm the trial court's judgment on this issue.

¶ 64                                    III. Dissipation

¶ 65         Respondent next argues that the trial court erred in finding that petitioner's expenditures on Sufism did not constitute dissipation. "Dissipation occurs when one spouse uses a marital asset for his or her sole benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown." *Dhillon*, 2014 IL App (3d) 130653, ¶ 36 (citing *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 983 (1992)). "The spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the marital funds were spent." *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 983 (1992). This is "generally a fact-intensive inquiry that calls upon the trial court to make a credibility determination as to the explanation given by the spouse charged with dissipation as to how the funds were used." *Dhillon*, 2014 IL App (3d) 130653, ¶ 36. Accordingly, a trial court's ruling on dissipation will not be reversed on appeal unless it is against the manifest weight of the evidence. *Dhillon*, 2014 IL App (3d) 130653, ¶ 36. As noted, "[a] finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is arbitrary, unreasonable, or not based upon the evidence presented." *Dhillon*, 2014 IL App (3d) 130653, ¶ 29.

¶ 66         In the case at bar, the trial court denied respondent's request for a finding of dissipation as to petitioner's contributions to the Sufi religion, finding that, "[f]irst, prior to the breakdown of the parties' marriage, the parties made donations to the Sufi religion and, therefore, [petitioner's] contributions to the Sufi religion constitute an extension of patterns of practice established during the marriage. Second, the Court declines to characterize the Sufi religion as a 'cult' as argued by [respondent] and finds that it is not dissipation for

27

[petitioner] to support charitable and religious activities that she determines to be appropriate." We cannot find this conclusion to be against the manifest weight of the evidence.

¶ 67    Respondent argues that this case is analogous to *In re Marriage of Cerven*, 317 Ill. App. 3d 895 (2000), in which donations to a church were determined to constitute dissipation. However, we agree with petitioner that *Cerven* is factually distinguishable from the case at bar. In *Cerven*, the wife and children attended services at the Church of Jesus Christ of Latter Day Saints and the husband did not object to their attendance and also attended special church events such as the children's baptisms. *Cerven*, 317 Ill. App. 3d at 897. The wife began paying tithes to the church beginning in 1984, which was the first time the wife claimed that the husband objected to anything concerning the church. *Cerven*, 317 Ill. App. 3d at 897. From 1984 to 1987, the wife made contributions ranging from $102.32 to $399.19, and did not make any contributions from 1988 to 1993, other than a $180 contribution in 1991. *Cerven*, 317 Ill. App. 3d at 898. According to the wife's petition for dissolution of marriage, the marriage broke down at the end of 1994. *Cerven*, 317 Ill. App. 3d at 897. Thereafter, from 1994 to 1997, the wife began tithing between $1236.35 and $3853.56 "because she felt stronger about the church." *Cerven*, 317 Ill. App. 3d at 898. The trial court concluded that the wife's contributions to the church constituted dissipation, and the wife appealed.

¶ 68    On appeal, the appellate court affirmed the finding of dissipation, finding that the wife had failed to prove by clear and convincing evidence that the funds were expended for a family purpose. *Cerven*, 317 Ill. App. 3d at 902. The court indicated that in order to show that the money was for a family purpose under the facts of the case before it, the wife would

have needed to show that the husband had agreed to her tithing and other contributions. *Cerven*, 317 Ill. App. 3d at 901. However, the court noted that the husband was not a member of the church and there was "no sufficient pattern of payment before the breakdown" of the marriage, since the wife had made minimal contributions from 1984 to 1987 and had made no contributions whatsoever in the years 1988, 1989, 1990, 1992, and 1993. *Cerven*, 317 Ill. App. 3d at 902. Accordingly, the appellate court agreed with the trial court that the wife had failed to show that the funds were expended for a family purpose. *Cerven*, 317 Ill. App. 3d at 902.

¶ 69    In the case at bar, it is not clear whether respondent objected to petitioner's involvement in Sufism while the marriage was ongoing; petitioner testified that respondent never objected to her making donations to Sufism, while respondent testified that he did not approve of her involvement with the religion. This type of credibility determination lies squarely within the province of the trial court, and we will not disturb it on appeal. *In re Marriage of Manker*, 375 Ill. App. 3d 465, 477 (2007) ("The trier of fact is charged with assessing the credibility of testimony at trial. [Citation.] A reviewing court will defer to the trial court's findings because the trial court, 'by virtue of its ability to actually observe the conduct and demeanor of witnesses, is in the best position to assess their credibility.' " (quoting *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 980 (2006))). Additionally, we note that petitioner converted to the Sufi religion in 2007 and testified that she participated in Sufi seminars and retreats while she was living with respondent and that while respondent testified that he did not approve of the Sufi religion, he admitted that he had traveled with petitioner on Sufi-related trips. Petitioner further testified that she donated to Sufism while married to respondent and deducted her donations on her tax returns with respondent. Thus, we cannot find that the trial

29

court erred when it determined that the expenditures on Sufism were merely a continuation of a pattern that had existed during the marriage.

¶ 70    Petitioner also testified that her religious education was useful in her practice, because some patients sought a more spiritual approach and psychologists were increasingly integrating spirituality with psychology. We agree with petitioner that anything that benefited petitioner's employment prospects would benefit the marriage, as it would increase the value of the marital estate. Thus, her studies in Sufism could be characterized as being for a family purpose, as opposed to being for her sole benefit, and we accordingly cannot find that it was against the manifest weight of the evidence for the trial court to conclude that petitioner's expenditures on Sufism did not constitute dissipation.

¶ 71                              IV. Division of Property

¶ 72    Respondent next argues that the trial court erred in omitting the value of personal property awarded to petitioner when dividing the marital estate. As noted, under the Act, a court must classify property as either marital or nonmarital before it may dispose of property upon a dissolution of marriage. 750 ILCS 5/503(c) (West 2008). After classifying the property, the trial court gives to each spouse his or her nonmarital property, and the marital property is divided into "just proportions." 750 ILCS 5/503(d) (West 2008). In order to divide the marital property in just proportions, the trial court first must establish the value of the parties' marital and nonmarital assets. *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736 (2002). However, the Act does not require the court to place a specific value on each item of property. *In re Marriage of Hagshenas*, 234 Ill. App. 3d 178, 200 (1992). "We will not disturb a trial court's division of marital property unless an abuse of discretion is shown. [Citation.] A trial court does not abuse its discretion unless, in view of all of the

circumstances, its decision so exceeded the bounds of reason that no reasonable person would take the view adopted by the trial court. [Citations.]" *In re Marriage of Demar*, 385 Ill. App. 3d 837, 852 (2008).

¶ 73 In the case at bar, respondent claims that the trial court failed to consider the value of a 2008 Lexus automobile (valued by respondent at $25,985), two outstanding promissory notes (valued by respondent at $8865), personal clothing (valued by respondent at $10,000), and items taken by petitioner when she left the marital residence (valued by respondent at $52,000). However, in the judgment for dissolution of marriage, the trial court expressly assigned to petitioner "all the furniture, furnishings, automobiles, clothes, personal items and jewelry currently in her possession." Thus, there is no indication that the trial court "omitted the value" of any of the listed assets. Furthermore, we note that during trial, respondent admitted that some of the values he ascribed to the items that petitioner had taken were not based on appraisals, meaning that the trial court was not obligated to accept respondent's valuations. Finally, as noted, the Act does not require the court to place a specific value on each item of property. *Hagshenas*, 234 Ill. App. 3d at 200. Accordingly, we cannot find the trial court's division of property to be against the manifest weight of the evidence.

¶ 74          V. Maintenance

¶ 75 Finally, respondent argues that the trial court erred in awarding petitioner maintenance. Alternatively, respondent argues that the maintenance award of $8600 per month was too high, arguing that if petitioner was entitled to receive maintenance, it "should have been based on [petitioner's] actual needs for a limited and finite period of time." Under the Act, a court may grant temporary or permanent maintenance for a spouse "in amounts and for

periods of time as the court deems just." 750 ILCS 5/504(a) (West 2008). Section 504(a) further lists relevant factors to consider in determining maintenance, including:

"(1) the income and property of each party, including marital property apportioned and non-marital property assigned to the party seeking maintenance;

(2) the needs of each party;

(3) the present and future earning capacity of each party;

(4) any impairment of the present and future earning capacity of the party seeking maintenance due to that party devoting time to domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage;

(5) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment or is the custodian of a child making it appropriate that the custodian not seek employment;

(6) the standard of living established during the marriage;

(7) the duration of the marriage;

(8) the age and the physical and emotional condition of both parties;

(9) the tax consequences of the property division upon the respective economic circumstances of the parties;

(10) contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse;

(11) any valid agreement of the parties; and

(12) any other factor that the court expressly finds to be just and equitable." 750 ILCS 5/504(a) (West 2008).

32

" 'Maintenance issues are presented in a great number of factual situations and resist a simple analysis.' " *In re Marriage of Reynard*, 344 Ill. App. 3d 785, 790 (2003) (quoting *In re Marriage of Mayhall*, 311 Ill. App. 3d 765, 769 (2000)). "The trial court has discretion to determine the propriety, amount, and duration of a maintenance award. A reviewing court will not reverse the trial court's maintenance determination absent an abuse of discretion." *Reynard*, 344 Ill. App. 3d at 790 (citing *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 772 (1998)).

¶ 76    In the case at bar, the trial court concluded that petitioner was entitled to receive a reviewable maintenance award in the amount of $8600 per month, subject to review five years from the date of the judgment. Respondent's main issue with the trial court's award of maintenance is the fact that petitioner changed jobs from a full-time position paying $95,000 per year to a part-time position paying $50,000 per year. Respondent argues that petitioner is currently fully capable of supporting herself but chose to earn far less than she was capable of earning.

¶ 77    "Under the Act, a spouse requesting maintenance has 'an affirmative duty *** to seek and accept appropriate employment.' [Citation.] Where a spouse has the means of earning more income, he or she may not use self-imposed poverty as a basis for claiming maintenance. [Citation.]" *In re Marriage of Patel*, 2013 IL App (1st) 112571, ¶ 87 (quoting *In re Marriage of Schuster*, 224 Ill. App. 3d 958, 970 (1992)). "An award of maintenance to a spouse capable of improving his income can be an abuse of discretion." *Schuster*, 224 Ill. App. 3d at 970.

¶ 78    In the case at bar, we agree with respondent that the trial court should have considered petitioner's previous income in setting the amount of maintenance and that its failure to do so

constituted an abuse of discretion. Petitioner testified that in March 2013, she accepted a position in Birmingham to work in telemental health, a position which paid approximately $95,000 per year. However, in December 2013, she applied for and accepted a part-time job in sleep medicine in Atlanta which paid only slightly more than $50,000 per year and testified that she was not currently looking for a full-time position. We note that the trial court found that petitioner was not intentionally underemployed, a position that we will not second-guess on appeal, although we further note that the acceptance of both petitioner's position in Birmingham and her current position in Atlanta occurred during the pendency of the instant dissolution proceedings. Nonetheless, section 504(a) of the Act asks a court to examine "the present and future earning capacity of each party" in setting a maintenance award. 750 ILCS 5/504(a)(3) (West 2008). In the case at bar, it is clear that petitioner has a higher earning capacity than is reflected in her $50,000-per-year part-time job, especially since petitioner was actually receiving a salary of approximately $95,000 immediately prior to accepting the $50,000 position. Accordingly, the trial court should have considered petitioner's actual earning capacity in setting maintenance, not merely the amount she happened to be earning at the time. See, *e.g.*, *Schuster*, 224 Ill. App. 3d at 971 (in affirming a denial of maintenance, pointing out that "throughout the hearings in the cause, *** [the husband] emphasized that he not only held full-time demanding jobs but also worked at night doing legal work on the side. Regardless of whether he enjoyed it or not, this demonstrates that he is capable of such employment as will enable him to continue to enjoy the lifestyle he had during his marriage to [the wife].").

¶ 79    In the case at bar, the trial court should not have considered respondent's $50,000 salary in a vacuum, with no regard to either her past proven earning capacity or her anticipated

future earnings. We also note that, as discussed earlier in our analysis, petitioner was awarded a substantial sum from accounts that respondent claimed were nonmarital on the sole basis that respondent was unable to trace the source of funds to those accounts. While this is not a separate basis for reversal, on remand, the trial court should take the funds awarded to petitioner into consideration in setting an appropriate maintenance award, as the Act expressly asks a court to consider "marital property apportioned and non-marital property assigned to the party seeking maintenance" in setting a maintenance award. 750 ILCS 5/504(a)(1) (West 2008). Accordingly, we reverse the trial court's award of maintenance and remand for the trial court to consider all of the statutory factors, including petitioner's earning capacity, in setting any maintenance award.

¶ 80    With respect to respondent's additional arguments concerning maintenance, we do not find persuasive respondent's remaining arguments concerning the trial court's calculation of the maintenance award, namely, that the trial court should have considered the different standards of living in Chicago and Atlanta, and also should not have considered several of petitioner's expenditures in determining the maintenance award. As noted, the trial court stated that it considered all of the statutory factors in setting the amount of maintenance owed to petitioner, and set an award of maintenance that it determined was reasonable. We have discussed the problematic aspects of the trial court's determination and other than those aspects, we cannot find that its calculation was an abuse of the trial court's discretion.

¶ 81    Finally, we find no merit to respondent's argument that the trial court should have considered maintenance already paid by respondent. Respondent cites no authority for this proposition, and we will not consider an unsupported argument on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Feb. 6, 2013) (an appellant's brief must "contain the contentions of the

35

appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on").

¶ 82                                     CONCLUSION

¶ 83        The trial court's judgment for dissolution of marriage is affirmed where the trial court did not err in (1) classifying six accounts as marital property; (2) denying respondent's request for reimbursement for funds spent on the marital residence; (3) finding no dissipation in petitioner's expenditures on the Sufi religion; and (4) dividing the marital estate. However, the trial court abused its discretion in not considering petitioner's past earnings in awarding petitioner maintenance, and, accordingly, the cause is remanded to the trial court in order for it to consider all of the statutory factors, including these earnings, in setting any maintenance award.

¶ 84        Affirmed in part and reversed in part; cause remanded.