(text box: 1) NO. 5-02-0030

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

___________________________________________________________________________

In re
 MARRIAGE OF )  Appeal from the

MARGARET LYNN MILLER, )  Circuit Court of

)  Madison County.

     Petitioner-Appellee, ) 

)

and )  No. 97-D-1308

)

MAURICE H. MILLER, )  Honorable

)  Ellar Duff,

     Respondent-Appellant. )  Judge, presiding.

________________________________________________________________________

JUSTICE KUEHN delivered the opinion of the court:

This is a case where a financially successful orthopedic surgeon stopped practicing medicine and borrowed money to maintain his family's lifestyle during costly divorce proceedings that plodded on 
for more than four years
.  The marital estate withered to a shadow of its one-time worth before the trial judge could divide marital assets.  When it came time to divide the estate, the judge blamed the doctor for all of the losses incurred during the eternity taken to dissolve this marriage.  She found that he had squandered more than $2.235 million.  A host of dissipation findings treated the doctor to a share of the marital estate that had less value than the marital debt that he was ordered to assume.  His erstwhile spouse parted the marriage with approximately $1.6 million in unencumbered marital assets. 

We are asked to undo the disparity in the distribution of the marital estate, a request that turns upon whether the trial judge abused her discretion in reaching the various findings that Dr. Miller had frittered away most of the estate on things that benefited him.  

We do not overturn a determination that a spouse has dissipated assets, and therefore deserves to be charged with losses that occur on the road to a marriage's end, unless the trial judge's findings exceed the bounds of reason and ignore principles of law designed to ensure fair and just results.  
In re Marriage of Partyka
, 158 Ill. App. 3d 545, 550, 511 N.E.2d 676, 680 (1987).

For the reasons that follow, we think that many of the dissipation findings made in this case transcend reason and require the reevaluation of the asset-and-liability distribution between the parties.  We reverse and remand to start anew in arriving at a fair division of the marital estate.  Because the division of marital assets and liabilities is an integral part of the decision-making on an award of maintenance, we also vacate the permanent maintenance award entered in this case. 

Margaret Lynn Miller and Maurice Miller wed on January 21, 1981.  The marriage was blessed with three boys: Jonathon, Clifford, and Stuart.  Jonathon currently attends Purdue University.  The other two sons live with their father, who was awarded custody.  They will soon enter college, an expense their father must bear, along with the educational expenses of Jonathon. 

Margaret used to work as a registered nurse.  She quit working shortly after the wedding to become a homemaker.  The divorce proceedings depressed Margaret, and she exacerbated her problems with alcohol consumption.  She was hospitalized for alcohol-induced Tylenol toxicity and hepatic failure during the divorce's course.  She incurred hefty medical and insurance expenses that had to be paid during the pendency of the divorce proceedings.  By the divorce's conclusion, Margaret had maintained two years of sobriety through vigilant participation in Alcoholics Anonymous.  She remains under the treatment of numerous physicians, including a psychiatrist who testified on her behalf.  He gave his diagnosis that she suffers from major depressive disorder, panic attacks, alcohol dependence, and opiate medication abuse.  He further testified that she will never return to nursing absent great improvement.  However, he did not rule out that possibility. 

Maurice grew a successful medical practice during the marriage.  As these proceedings loomed, he earned medical fees of almost $600,000 annually.  He was actively engaged in that practice, paying four full-time employees, when the petition for the dissolution of the marriage was filed on October 27, 1997.  The action proceeded at an incredibly slow pace.  The parties had already endured 1½ years of torment attendant to divorce when, in May 1999, Maurice quit practicing medicine, other than continuing to care for several patients who were in the final stage of treatment.  Maurice maintained all four employees full-time with benefits for almost a year as the practice wound down.  After a year, all but one employee was terminated, and that remaining employee worked part-time.  It cost approximately $103,000 to keep these employees working and covered by workers' compensation benefits.  Maurice may have wanted to keep his practice together until the divorce was over, with plans to return to work at that time.  However, any such plan was thwarted by the incalculable pace of these proceedings.  It took 2½ years from the shutdown of his practice to bring this matter to a conclusion.  

The trial judge concluded that all the money spent on winding down his practice and closing shop dissipated the marital estate.  

Maurice testified that he did not quit a lucrative profession to visit financial harm upon himself and his estranged wife.  His overriding concern dealt with the fact that his medical practice left little time for other duties and enterprises.  He explained that the three boys, who were then all living with him, were traumatized by the lengthy divorce.  He felt that they were in need of more paternal support than he could give when practicing medicine.  In addition, he began to realize that the protracted stress of these proceedings over time was harming his clinical judgments and patient care.  His employees testified to corroborate this explanation for ceasing the practice of medicine.  They told of how Margaret would repeatedly call the office and interrupt work.  They observed Maurice's behavior after such calls.  His skin complexion would flush and his demeanor would turn dark and sullen.  He would cease what he was doing, retire to his office, and silently stare at the walls.  Maurice, who is a private pilot, stopped operating his airplane and grounded himself because of the mental uneasiness he felt from the stress of the divorce proceedings.  Maurice also testified that he was working on a medical text on osteoporosis and that the duties of a full-time practice were inconsistent with the time necessary to author this text.

Lastly, there was one other reason Maurice tendered to explain why his decision to cease practice was well-motivated.  He was absorbed in day-trading stock.  The Schwab account that served as the vehicle that he employed to engage in this enterprise proved to be the single largest asset in the marital estate.  Its value at the time that the marital assets were distributed was $1,231,793.  It was awarded in its entirety to Margaret.   

Maurice was either very good at trading stock or very lucky at it.  We assume that the success involved favorable market conditions, coupled with study and skill.  In 1994, there was $118,626 in the Schwab investment account.  By year's end in 1996, the account's balance was $841,083.  The year 1997 was the year in which marital discord surfaced.  It culminated in the October initiation of divorce proceedings.  Maurice wrote two checks out of the account that year that totaled $247,283.63.  One of the checks, $156,642, helped to purchase Margaret a new residence after the separation.  Despite this large withdrawal from the account, its value at the end of 1997 was $942,750.  While the divorce lingered on in 1998, Maurice's day-trading grew the account to a balance of $2,660,119.  Maurice quit his practice in May of 1999 at a time when he was experiencing a financial success in the stock market that dwarfed what he could earn toiling at the practice of medicine.  By September of 1999, the Schwab investment account had grown to more than $4.1 million.  Maurice made more than $1.4 million in the stock market in the first four months after quitting the practice of medicine. 

While Maurice was allowed to trade the Schwab account, he was not allowed to harvest any of his gains to defray most of his expenses.  Legal fees and litigation costs were siphoned off of the account, but Maurice was not supposed to pay anything else from it.  

On August 31, 1999, Maurice petitioned the court for permission to liquidate the Schwab account, to pay the taxes on all of its gains, and to thereafter pay property taxes of $24,000, a stock margin loan and interest totaling $200,000, an $80,000 debt of the medical practice corporation, the corporation's vehicle leases totaling $56,000, medical practice taxes and accrued salary of $125,000, medical malpractice insurance and office overhead of $27,000, and mortgage payments totaling $11,000.  

After a hearing on the petition, the trial judge found that Maurice was dissipating marital assets.  The court order directed that "no more payments are to be made out of anything" without Margaret's consent or an order from the court.  While it allowed Maurice to pay off property taxes and debts, the order prohibited selling any of the account's stock.  Because of her dissipation finding, the trial judge found that the payment of those marital debts that she had authorized to be paid from the account constituted a distribution of marital assets to Maurice.  

Maurice violated the judge's order two times.  In fear of the rapidly falling stock market, Maurice liquidated the account in December of 1999.  Because many of the investments were short-term, Maurice had to pay $1.5 million in taxes from the account balance.  The account's assets stood protected from a waning market at $2,660,119.  It was uncontradicted that had he not acted, the account's value would have shrunk to less than half of the December 1999 value in the ensuing two years of these divorce proceedings.  

There were no contempt proceedings for this violation of the September 1999 order.  However, in the final judgment of dissolution, the trial judge determined that the payment of the income taxes due on the sale dissipated the marital estate by $508,394.  

Maurice also removed $123,143 from the Schwab account in violation of the order.  He paid $50,000 in taxes and put the rest in his checkbook.  Again, Maurice could have been penalized for disregarding the trial judge's order, but a rule to show cause did not issue.  Instead, two years later the trial judge found that he had dissipated the marital estate because the funds were not shown to have been "used to preserve, enhance, or otherwise benefit the marital estate or provide necessities for the family."  

Maurice was slowly collecting the remaining accounts receivable from his practice, and a few marital assets were sold and the proceeds divided.  But this income was not nearly enough money to defray the costs of living through this divorce, particularly in the style and manner to which this family had grown accustomed.  He did not have the cash to maintain the marital airplane, the marital Colorado estate, the marital home, or his estranged marital partner for four years.  His answer was to borrow the money.  Over the next 2½ years, he borrowed $700,000. 

He spent $22,718 to replace a broken generator and restore well water to the residence located on the Colorado estate.  He spent $108,503 on the marital residence to fix a serious dry-rot drainage problem, leaking doors, and a bad roof.  He spent $71,101 on hangar rent, annual maintenance, mechanical repairs, and new paint for the marital twin-engine aircraft.  He spent more than $100,000 for his estranged wife's maintenance and medical bills.  He bought a ski boat and a trailer for the boys and stored it at a marina.  The total cost was $37,485.  He purchased furniture and appliances totaling $5,346.  He bought himself a computer for $4,815, a tractor for $24,233, and a utility trailer for $3,671. 

He borrowed to pay for these expenses, as well as to pay for the day-to-day living expenses that he and his three boys incurred.  He borrowed to pay the debt service on the debt.  The judge found that all of these expenses and purchases dissipated the marital estate.  She also found that the debt incurred to pay for them dissipated the estate.  

Finally, the value of Maurice's medical practice was found to be $456,000, all but $60,000 of which was in accounts receivable.  The judge found that Maurice dissipated the marital estate by this amount.  

Had Maurice sustained his stock market success throughout the divorce's lengthy duration, the bank notes would have been easy to resolve.  As things turned out, the trial judge awarded Maurice the marital home and the $408,631 mortgage that came with it, and she ordered Maurice responsible for all of the debt that had accumulated during the divorce.  Thus, Maurice, who found a job practicing medicine and returned to work before the divorce was finalized, was left to pay off more than $1.3 million in debt, while earning roughly $13,000 per month at his new job.  Added to this burden, Maurice was ordered to pay $3,500 a month to Margaret in permanent maintenance and to defray $1,000 of her monthly medical bills.  Maurice, his two boys living at home, and Jonathon, who was off at college, were left with very little upon which they could live. 

To be sure, Maurice did not live like someone without a job and in the midst of a divorce.  He borrowed, and lived on borrowed funds, like someone who had experienced the easy money to be made on buys, sells, puts, and calls, money made in a rapidly rising bubble of capitalism.  In the first two years of this divorce he grew the value of the marital account by more than $3 million.  Many of his lavish expenditures portrayed him more the spendthrift when the stock market continued its slide in the last two years of the endeavor to end this marriage, and he lost close to $1 million of what he had previously made investing.  

The ultimate result in this case, forged upon numerous findings of dissipation, has its origin in Maurice's decision to stop practicing medicine.  Once he decided to quit his practice and relinquish the income that it would have provided to defray expenses, every expense incurred was deemed to dissipate the marital estate.  This is apparent from the trial judge's order of September 15, 1999.  The payment of property taxes on marital real estate was charged to Maurice as dissipation, presumably because the trial judge felt that they should have been paid from income earned as a physician instead of the $1.4 million worth of gain made through trading efforts between May and September of 1999.  

Dissipation is the use of marital property for one spouse's sole benefit or for a purpose unrelated to the marriage at a time when the marriage is undergoing irreconcilable breakdown.  
In re Marriage of Norris
, 252 Ill. App. 3d 230, 235, 625 N.E.2d 6, 10 (1992); 
In re Marriage of Partyka
, 158 Ill. App. 3d at 549, 511 N.E.2d at 680.  Maurice, through his trading labor, bought Margaret a separate home, free of debt, and grew the marital estate by $3 million during the first two years of this divorce.  He made almost $1.2 million, allowing for the margin loan, between May and September of 1999.  The property taxes and other debts that had accumulated were far less than the money Maurice kept making.  Dissipation contemplates a diminution in the marital estate's value due to a spouse's actions.  Although a spouse may not necessarily derive a personal benefit from the acts that constitute dissipation (
In re Marriage of Petrovich
, 154 Ill. App. 3d 881, 886, 507 N.E.2d 207, 210 (1987)), expenditures that form the basis for dissipation should have some detrimental effect upon the marital estate.  There simply was no reason to find that the payment of property taxes due on marital property constituted dissipation.  The same is true of a marital debt such as the stock margin loan, a debt used to grow, rather than diminish, the marital estate's value. 

The concept of dissipation is premised upon waste.  If a spouse's actions do not squander the marital estate's value, that spouse's actions cannot constitute dissipation.  While Maurice could certainly have been penalized for violating the trial judge's order by selling all of the stock in December of 1999, his action in doing so, even though it incurred added tax consequences, cannot constitute dissipation.  Indisputably, the liquidation of the account served to preserve marital property, rather than waste it.  The payment of the income taxes incurred in selling off the stocks was a necessary consequence of preventing further loss to the marital estate, not a waste of that estate.  There was no reason to find that Maurice dissipated assets by $508,394 when he paid the marital tax liability on the stock transactions. 

Although courts have found dissipation in the devaluation of a business (
In re Marriage of Thomas
, 239 Ill. App. 3d 992, 995, 608 N.E.2d 585, 587 (1993)), the situation here is far removed from those circumstances that support such a conclusion.  Here, Margaret was ill and incapable of parenting three teenage sons.  That responsibility fell upon Maurice's shoulders.  Margaret was incapable of contributing anything other than bills for her treatments during the four years of this litigation.  

The medical profession is an exacting endeavor that takes an extreme amount of personal effort and time, and there was nothing unreasonable in a decision to cease practice under the circumstances that Maurice confronted.  It was clearly corroborated, and uncontradicted, that the stress of this divorce was impairing Maurice's ability to function properly as a practicing physician.  Moreover, Maurice had less time-consuming and more lucrative means of making money at the time–a method that he thought would sustain the family, prevent him from putting patients at risk by virtue of his mental state, and allow him to properly parent his sons while working on the publication of a medical text.  The finding of dissipation for closing his practice presumes that he would have made the same $1.4 million on the stock market without the added attention to trading that ceasing his practice allowed.  In addition, the finding that Maurice had dissipated the entire value of the practice ignored the fact that almost all of that value was in accounts receivable, most of which were collected and added to the marital estate by virtue of this divorce's duration.

The method of ending the practice presents a different situation.  It seems clear that Maurice could have closed the practice far more expeditiously, had he not been driven by a desire to hold the practice intact in order to facilitate his return at a later time.  He could have sold the accounts receivable and wound down loose ends in far less than a year.  Instead, he maintained a full staff at full pay.  This was done, at least in part, to promote a personal benefit to the detriment of the marital estate.  However, a finding that the entire amount spent, more than $103,000, constituted dissipation is untenable.  Certainly a portion of this amount was reasonably incurred to follow up on patients, to prepare medical reports, to conduct billings, and to collect accounts receivable.  

The trial judge found that buying a new generator for the Colorado home, enabling the well to produce water, and making structural repairs to the marital residence constituted dissipation.  These were expenditures to maintain and preserve the value of marital assets and could not constitute dissipation.

The trial judge found that hangar fees, repairs, maintenance, and paint for the marital twin-engine aircraft constituted dissipation.  Unairworthy engines and corroded airframes render aircraft worthless.  These were expenditures to maintain and preserve the value of a marital asset and could not constitute dissipation. 

The trial judge found that the cost of numerous items–furniture and appliances, a ski boat, a computer, a tractor, and a utility trailer–constituted dissipation.  Since all of the items were valued at cost and distributed to Maurice as his share of the marital estate, their cost could not constitute dissipation.  The transfer of one marital asset to another marital asset is not dissipation.  
In re Marriage of Hellwig
, 100 Ill. App. 3d 452, 464, 426 N.E.2d 1087, 1095 (1981).

The trial judge found that Maurice's withdrawal of $123,143 from the Schwab account was dissipation.  This finding was based upon the conclusion that Maurice had failed to demonstrate that the funds were "used to preserve, enhance, or otherwise benefit the marital estate or provide necessities for the family."  Maurice paid $50,000 in taxes and deposited the remainder of these funds in his checking account.  It appears that a lot of this money was spent on basic living expenses for Maurice, Margaret, and the three boys.  Paying monthly support of $2,700 to his estranged partner out of the funds could hardly be dissipation.  The payment of usual and necessary living expenses is not dissipation.  
In re Marriage of Seversen
, 228 Ill. App. 3d 820, 826, 593 N.E.2d 747, 751 (1992). 

Finally, the trial judge found that all of the additional debt incurred during the pendency of the divorce constituted dissipation.  Given some of the expenditures made from the borrowed funds, we are certain that not all of the debt constituted dissipation.  The payment of Margaret's support and medical expenses could not be dissipation.  While the trial judge's finding on this issue is at least partially in error, in the absence of a full accounting of how the borrowed monies were spent, some portion of this amount could support a dissipation finding.  Accordingly, the issue of the borrowed funds, together with the expenses incurred in closing the medical practice, may be further addressed upon remand, to properly determine the extent to which Maurice should be charged with dissipating the marital estate.    

Because we have disagreed with a number of dissipation findings, the ultimate distribution of marital assets is distorted and the division of those assets must be redone.  Maurice is entitled to more of the marital estate than he received.  In addition, we vacate the $3,500 award of permanent maintenance and the $1,000 monthly payment of medical expenses, in order to enable the trial judge to reconsider permanent maintenance and medical  reimbursements in light of the new division of marital property, potentially new financial conditions, and a potential improvement in Margaret’s mental and physical condition, all of which could conceivably alter such an award in a substantial way.

For the reasons stated, we affirm as modified in part and reverse in part and remand for further proceedings consistent with this decision.  

Affirmed as modified in part and reversed in part; cause remanded.

CHAPMAN and DONOVAN, JJ., concur.

COMMENTS AND ANNOTATIONS
Text Box 1:

TEXT BOXES
NOTICE

Decision filed 08/13/03.  The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.