2020 IL App (1st) 181897-U

No. 1-18-1897

Third Division
June 30, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) ) | Appeal from the Circuit Court of |
| DIMITRA SVIGOS, | ) ) | Cook County. |
| Petitioner-Appellant, Cross-Appellee | ) ) ) | No. 12 D 5349 |
| and | ) ) | |
| MICHAEL D. SVIGOS, | ) ) ) | Honorable John Thomas Carr, |
| Respondent-Appellee, Cross-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices McBride and Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The order of the circuit court in a divorce action is affirmed where the court did not err in determining the maintenance award, in rejecting the wife's claims of dissipation, or in denying the wife's motions to re-open proofs.

¶ 2    Petitioner, Dimitra Svigos ("Dimitra"), appeals from an order of the circuit court dissolving her marriage to respondent, Michael Svigos ("Mike"). Dimitra argues that the circuit court (1) abused its discretion in calculating Mike's income for purposes of awarding her permanent

maintenance, (2) erroneously denied her claims of dissipation, and (3) abused its discretion in denying her motions to re-open proofs. On cross-appeal, Mike also argues that the circuit court abused its discretion in determining the amount of permanent maintenance by inflating his income and by crediting one of Dimitra's experts who testified to the parties' lifestyle expenses. For the following reasons, we affirm the circuit court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4     The proceedings below were exceptionally extensive and contentious, contributing to a record on appeal of nearly 25,000 pages. We recount the facts only to the extent necessary to resolve the issues on appeal.

¶ 5     The parties were married on October 26, 1986. During the marriage, Mike was a successful businessman with interests in numerous securities, grocery stores, and pieces of real estate. Dimitra took care of the home and was never employed. The parties had five children, all of whom were adults when Dimitra filed for divorce on May 31, 2012. The circuit court entered an order dissolving the marriage on August 1, 2018.

¶ 6                          A. Maintenance and Mike's Income

¶ 7     Prior to trial, Dimitra filed a motion for temporary support in the amount of $68,000 per month. After a hearing in September 2012, the circuit court found in a written order that Mike had an "undisputed ability" to provide Dimitra with support commensurate with the "luxurious lifestyle" she enjoyed during the marriage. However, the court found many of Dimitra's claimed expenses to be excessive or not credible. Accordingly, the court awarded Dimitra temporary maintenance of $38,500 per month, an amount it found more in line with her reasonable expenses and marital lifestyle.

¶ 8       The trial began on May 21, 2015. There, the following evidence of Mike's income was presented. The parties' joint federal income tax returns reported total income of $2,779,026 in 2009; $2,964,590 in 2010; and $2,976,325 in 2011. Mike's individual federal tax returns reported income of $3,859,366 in 2012 and $3,152,621 in 2013. His 2013 income included $245,651 in depreciation recapture on certain equipment used in two of his grocery stores and $2,161,371 in capital gains, most of which was realized from the sale of those two stores. Mike's 2014 tax return reported income of $449,608. Finally, Mike's financial affidavit reported an income of $316,299 for 2015.

¶ 9       One of Dimitra's main trial theories was that Mike received large amounts of cash from his businesses that he did not include on his tax returns. As exemplary, Dimitra testified that Mike gave her $20,000 in cash every month during their marriage. Dimitra also presented the testimony of Irene Graspas, her "very best friend," who stated that Dimitra used cash "[a]ll the time." Graspas recalled one instance in particular in which she observed Dimitra retrieve an envelope of cash from her bedroom before purchasing a piece of jewelry for over $10,000 in cash. Vasilios Ioannitis, a former employee of one of Mike's grocery stores, testified that his duties included counting the store's cash receipts from the previous day and preparing a deposit slip several times per week. After preparing the deposit slip in the morning, he would place the cash in a sealed bag and leave it in a safe until an armored car picked it up in the early afternoon. There were numerous occasions where Ioannitis noticed that the amount on the deposit slip he prepared differed from the copy left by the armored car company.

¶ 10      Fotene Liakatas, a certified public accountant employed by Miller Cooper & Company, testified as Dimitra's expert. Liakatas prepared a report of the parties' marital lifestyle for the years

2009 through 2012 using a "modified sources and uses approach," which entailed comparing the parties' income with their spending. Liakatas determined the parties' income through their tax returns and the transfers into their various bank accounts. She determined the parties' spending through transfers out of their accounts and Dimitra's representations about the parties' use of cash. Liakatas also reviewed a minimal number of credit card statements and receipts provided by Dimitra. She did not speak to Mike when compiling her report.

¶ 11    Liakatas determined that the cash payments and bank transfers attributable to the parties' lifestyle expenses totaled $2,505,318 in 2009; $4,122,641 in 2010; $7,794,269 in 2011; and $6,733,059 in 2012. After comparing the parties' reported income and bank statements to this spending, Liakatas also concluded that the parties funded their lifestyle in part with unreported cash. She calculated the amount of unreported cash to be $391,451 in 2009; $126,536 in 2010; $532,744 in 2011; and $720,460 in 2012.

¶ 12                    B. Sale of Niles Grand, LLC

¶ 13    In January 2013, Dimitra learned that Mike had reached a deal to sell his 25% interest in the grocery store Niles Grand, LLC ("Niles Grand") for $1.5 million. Dimitra filed an emergency motion to enjoin the sale. After a hearing, the court denied Dimitra's motion in a written order, finding that Mike sold his interest for "more than it was worth" and did not "squander[ ]the proceeds," but rather used them to pay off an outstanding promissory note and other past-due expenses for two of his other marital businesses.

¶ 14    After the court allowed the sale, the transaction became part of the approximately $15 million in dissipation that Dimitra alleged throughout the course of the proceedings. Dimitra claimed that the sale of Niles Grand was dissipation because it was both (1) a "sham" designed to

remove the store from the marital estate only for the duration of the divorce proceedings and (2) sold for less than its worth as determined by her expert, Timothy Meinhart.

¶ 15     At trial, Meinhart testified that he evaluated Mike's interest in Niles Grand using a weighted average of (1) the "direct capitalization method," which involved estimating the store's net cash flow from its net income in the three years preceding the sale, and (2) the "publicly-traded company approach," which entailed comparing the market values of publicly-traded grocery stores that were as similar as possible to Niles Grand. Meinhart did not review a budget or business projections from Niles Grand, and he did not conduct an interview with Mike or any other member of the store's management team. Using the weighted average, Meinhart concluded that Niles Grand had a total value of $16.5 million. Further adjusting for the fact that Mike owned only a 25% non-marketable, non-controlling interest, Meinhart determined that the value of Mike's interest on the day before the sale was $2.89 million. Meinhart was aware of the sale when conducting his evaluation, but he did not investigate that transaction or factor the sale price into his calculations.

¶ 16     Dimitra also called as a witness Anton Marano, the owner of the company that purchased Mike's interest. Marano testified that he did not review any financial statements or prepare any financial projections before the sale, but rather arrived at the final price by negotiating with John Svigos ("John"), Mike's brother with whom Marano had done business for over 30 years. At the time Marano acquired Mike's interest, John also owned an interest in Niles Grand and managed the store's day-to-day operations. Marano did not take an active role in managing the store and did not regularly visit the premises. However, Marano believed he paid fair market value for Mike's interest because he trusted John's integrity.

¶ 17    Mike testified that John suggested Marano as a potential buyer upon learning that he wanted to sell his interest in Niles Grand. After John confirmed that Marano was interested, Mike met with Marano and Marano's lawyers for initial negotiations several months prior to the deal closing. John subsequently negotiated the final price with Marano.

¶ 18    John testified that Mike negotiated the price with Marano, but that he (John) discussed the sale with Marano in his capacity as the manager of Niles Grand so that Marano would understand that a condition of the sale was for Marano not to participate in the day-to-day operations of the store.

¶ 19                    C. Elaine Alexander and Longfellow

¶ 20    Throughout the trial proceedings, Dimitra also challenged, as dissipation, certain transfers out of Elaine Alexander, Inc. ("Elaine Alexander") and Longfellow, Inc. ("Longfellow"), two stock trading entities that Mike owned with John. These entities were managed for a fee by Svigos Asset Management ("SAM"), a company owned by another of Mike's brothers, Paul Svigos ("Paul"). The evidence established that Mike and John began to wind down the Elaine Alexander and Longfellow accounts sometime in 2012. Tax returns showed that Elaine Alexander's total assets decreased from $1,926,964 at the end of 2011 to $1,516,727 by the end of 2012, mostly due to the payment of a $557,262 account payable. Becky Schierer—a SAM employee who managed the Elaine Alexander and Longfellow accounts—and Jason Wright—Mike's expert in the field of forensic accounting—both explained that the payment was a repayment of an earlier loan from SAM. The assets of Elaine Alexander were further reduced to $0 by the end of 2014, with Mike and John receiving total distributions of $944,144 each.

¶ 21 Similarly, Longfellow's total assets decreased from $2,031,630 at the end of 2011 to $1,077,060 by the end of 2012, mostly due to a $822,430 payment to SAM. Again, Schierer and Wright both testified that this was the repayment of a loan from SAM. Longfellow's assets were depleted by the end of 2014, with Mike and John receiving total distributions of $1,050,874 each. Schierer and Mike's experts traced Mike's share of the distributions from Elaine Alexander and Longfellow into his personal accounts. Banks records showing the transfers into Mike's accounts were admitted into evidence.

¶ 22                       D. Svigos Asset Management

¶ 23 Another of Dimitra's theories at trial was that Mike had an undisclosed ownership interest in SAM. Aside from trading for and lending money to Elaine Alexander and Longfellow, SAM also managed, for a fee, many real estate properties in which Mike, John, and Paul had interests. During discovery, Dimitra requested financial documents related to Mike's alleged interest in SAM, including SAM's tax returns for the years 2011 through 2014. After Mike responded that he did not own any interest in SAM, Dimitra filed her second motion to compel discovery of the records. The trial court ultimately issued an agreed order stating that Dimitra withdrew her request without prejudice, but that she would be allowed access to balance sheets for Mike's companies that were managed by SAM. At trial, Mike, Paul, and multiple SAM employees testified that Paul was the sole owner of SAM. Dimitra eventually recognized that Paul was the sole "legal title owner" of SAM, but contended that Mike nevertheless remained "an actual owner and a beneficial owner."

¶ 24                       E. Dimitra's Motions to Re-Open Proofs

¶ 25    Proofs closed on April 26, 2016. Thereafter, Dimitra filed four separate motions to re-open proofs. The first such motion concerned Dimitra's dissipation claim regarding the sale of Niles Grand. She offered liquor license renewal applications for Niles Grand from 2013 through 2015 that still listed Mike as a part owner. The circuit court allowed Dimitra to take additional discovery on whether Mike retained an interest in the store. At an evidentiary hearing on the motion, Dimitra presented no new documents or witness testimony. The circuit court denied the motion, as well as Dimitra's subsequent motion to reconsider the denial.

¶ 26    Dimitra's second motion to re-open proofs, which was also denied, is not relevant to the issues on appeal.

¶ 27    Dimitra's third motion to re-open proofs concerned her claim that Mike owned an interest in SAM. In support, Dimitra offered five complaints from 2013 and 2014 that SAM filed with the Circuit Court of Cook County in cases unrelated to the divorce proceedings. In each of these complaints, SAM alleged that it owned a piece of real estate in which Mike also had an interest. The circuit court denied Dimitra's motion after a hearing, stating that "I'm a great believer where there's smoke there is fire" but "I don't even find a whiff of smoke in this." Rather, the judge found—based on his 35 years of experience practicing this area of law—that the complaints were "just incorrectly done" and that SAM filed them on behalf of the true owners of the real estate.

¶ 28    Dimitra's fourth motion to re-open proofs again concerned Mike's alleged interest in SAM. This time, Dimitra offered three 2014 Cook County property tax complaints in which SAM again alleged that it was the owner of three pieces of real estate in which Mike had an interest. The circuit court allowed Dimitra to take additional discovery on the issue.

¶ 29    At the hearing on the motion, Dimitra did not present any witness testimony. Mike called Nick Vittore, SAM's Vice President of Real Estate, who testified that Paul is the sole owner of SAM. Vittore also stated that SAM does not own any real estate, but manages the properties listed on the tax complaints in question. He explained that SAM would occasionally be listed on various filings as the owner of the property it manages because SAM was an "authorized agent" to file on behalf of the true owners.

¶ 30    Mike also called Brian Liston, the attorney who filed the tax complaints. Liston testified that he had always listed SAM as the plaintiff on such pleadings over the past 15 years because SAM was authorized to challenge the taxes on behalf of the building's owners. Liston also explained that a tax appeal is governed not by what entity is listed as the plaintiff, but by a property index number tied to the legal title holder. Thus, the fact that SAM's name was listed "doesn't affect the tax appeal at all." However, Liston requested and was granted leave to amend the tax complaints after Mike's counsel brought the issue to his attention.

¶ 31    The court denied Dimitra's motion.

¶ 32                             F. Circuit Court's Findings

¶ 33    Following trial and the denial of Dimitra's motions to re-open proofs, the court made the following findings, both orally and in a written order. The court found Mike's testimony not credible regarding his income, but "more credible" on other topics. The court stated that it was "suspicious" that Mike's reported income dropped significantly after Dimitra filed for divorce. The court also credited the testimony of Dimitra, Liakatas, and Ioannitis in determining that the parties' expenses exceeded their reported income and that it was "more probably true than not" that Mike received unreported cash from his businesses.

¶ 34    The court determined Mike's income for maintenance purposes to be $1,306,176. The court arrived at this amount by averaging the income reported on Mike's tax returns from 2013 through 2015, which the court assigned greater weight because they were the most recent returns available. Based on this income, the court awarded Dimitra permanent maintenance in the amount of $20,000 per month. The court also concluded that each party was entitled to an equal share of the marital estate and retirement accounts, which amounted to $7,099,191.50 and $2,501,590 each, respectively. In order to equalize the division of marital property, the court ordered Mike to pay Dimitra $4,428,121, which was to be paid over 15 years at 9% interest. The court explained that the interest payments and its $20,000 per month maintenance award would combine to cover Dimitra's reasonable expenses, and in fact would slightly exceed Dimitra's request for $38,500 per month in permanent maintenance.

¶ 35    The court further found that there was "no credible evidence of any dissipation by Mike," that Mike rebutted all of Dimitra's claims by clear and convincing evidence, and that Dimitra's "various theories" about Niles Grand and SAM were "unfounded." In particular, the court found that there was "no evidence" that the sale of Niles Grand was "anything but [an] arm's-length business transaction[ ] that occurred in the normal and ordinary course of business." The court also concluded that Mike received "reasonable and adequate remuneration" and no longer owned any interest in Niles Grand. The court stated that Meinhart's evaluation of Niles Grand was not credible because he was impeached on cross-examination and did not investigate the circumstances of the sale.

¶ 36    With respect to the dissipation claims regarding Elaine Alexander and Longfellow, the court found that Mike rebutted Dimitra's allegations by tracing the funds into his personal

accounts. In particular, the court found that Wright's testimony and report were "credible," "unimpeached," and "supported with ample documentation for each disputed dissipation transaction."

¶ 37    Finally, the court found that there was "no credible evidence that Mike has an interest of any kind in Svigos Assessment Management." Instead, the evidence showed that Paul is the sole owner of SAM and Mike "has nothing to do with that business." This appeal followed.

¶ 38                                II. ANALYSIS

¶ 39    Initially, we acknowledge that Mike asks us to strike several portions of Dimitra's appellate brief for violations of Illinois Supreme Court Rule 341(a). We admonish Dimitra that our supreme court's rules are mandatory and not merely suggestions. *Perona v. Volkswagen of America*, Inc., 2014 IL App (1st) 130748, ¶ 21. However, striking an appellate brief, whether in whole or in part, is "a harsh sanction and appropriate only when the violations hinder our review." *Burrell v. Village of Sauk Village*, 2017 IL App (1st) 163392, ¶ 14. Here, Dimitra's brief does not hamper our ability to consider the issues on appeal. Accordingly, we address her arguments on their merits.

¶ 40                    A. Mike's Income and the Maintenance Award

¶ 41    On appeal, Dimitra first argues that the circuit court abused its discretion in calculating Mike's income for purposes of determining the maintenance award. Specifically, she asserts that the court should not have considered the income Mike reported in 2014 or 2015 but should have instead averaged his reported income from 2009 through either 2012 or 2013. Alternatively, Dimitra suggests that the court could have averaged Mike's reported income from 2009 through 2015.

¶ 42    When determining whether to award permanent maintenance, a circuit court is required to follow the guidelines set forth in the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et. seq.* (West 2018)). One factor for the court to consider is the "present and future earning capacity of each party." 750 ILCS 5/504(a)(3) (West 2018). The court's determination of the parties' incomes is a factual matter and will not be disturbed absent an abuse of the court's discretion, which occurs only where no reasonable person could take the view adopted by the court. *In re Marriage of Evanoff and Tomasek*, 2016 IL App (1st) 150017, ¶ 23.

¶ 43    Dimitra acknowledges that income averaging over a period of years is an approved method to calculate a party's income, but contends that the income Mike reported in 2014 and 2015 was too unreliable to include. Her argument centers on the circuit court's findings that Mike's testimony about his income was not credible, that it was "more probably true than not" that Mike received unreported cash from his business, and that it was "suspicious" that Mike's reported income dropped in the years following Dimitra's petition for dissolution of marriage.

¶ 44    The facts of this case are similar to those in *In re Marriage of Gabriel and Shamoun*, 2020 IL App (1st) 182710. There, the circuit court found that the husband's income was difficult to ascertain due to his lack of credibility and failure to disclose all sources of his income. *Id.* ¶¶ 16-17. In particular, the court found that the husband could not credibly explain why his income dropped by nearly 50% in the year after his wife filed for divorce. *Id.* Accordingly, the circuit court determined the husband's income for maintenance purposes by averaging his income from the year of the divorce petition and his income from the year after. *Id.* ¶ 17.

¶ 45    We affirmed this approach on appeal, stating that income averaging is appropriate where a party's income fluctuates from year to year, especially where the court has good reason to doubt

the party's credibility. *Id.* ¶ 40, citing *In re Marriage of Garrett*, 336 Ill. App. 3d 1018, 1025 (2003). We also rejected the argument that the court should have considered additional years in its average, explaining that "the number of years to consider generally 'must be left to the discretion of the trial court, as the facts will vary in each case.' " *Id.* ¶ 41 (quoting *In re Marriage of Freesen*, 275 Ill. App. 3d 97, 103 (1995)).

¶ 46 Here, as in *Gabriel*, the circuit court properly averaged Mike's reported income over the most recent years available to determine the maintenance award. Although Dimitra argues that the 2013 data was too unreliable to use because of Mike's lack of credibility and the possibility of unreported cash, these factors were the reason we found the averaging approach in *Gabriel* appropriate in the first place. Thus, contrary to Dimitra's claims, the circuit court's method of determining income did not conflict with its own findings regarding Mike's testimony. We also note that the evidence regarding Mike's use of unreported cash concerned years prior to 2013. Additionally, although Dimitra argues that the court should have considered more pre-divorce years when averaging Mike's reported incomes, we defer to the circuit court's decision not to go any further back than 2013 in light of the facts of this case. The evidence showed that the sources of Mike's income changed dramatically since Dimitra filed for divorce, including the court-approved sales of three of his grocery stores, the winding down of his stock trading businesses, and the Svigos brothers' decision to forgo distributions from their real estate holdings in order to grow their business.

¶ 47 We also reject Dimitra's argument that the circuit court "effectively recognized its error by acknowledging that its $20,000 per month maintenance award was not enough to meet Dimitra's needs." First, Dimitra's needs were but one of at least 14 factors that the circuit court was required

to consider when fashioning a maintenance award. 750 ILCS 5/504(a)(1-14) (West 2018). Second, the court specifically explained that Dimitra's expenses would be covered by the $20,000 per month maintenance award and the interest from Mike's monthly payments toward the nearly $4.5 million property equalization award. In fact, the court noted the maintenance and interest payments would actually exceed Dimitra's trial request for $38,500 per month in permanent maintenance. We also note that, in addition to the permanent maintenance and interest, Dimitra was also awarded over $9.5 million between her share of the marital estate and the parties' retirement accounts. Under these circumstances, the circuit court did not abuse its discretion in determining the maintenance award.

¶ 48    On cross-appeal, Mike also challenges the court's maintenance award. First, he argues that the court inflated his income by including the entire amount of taxable income reported on his 2013 tax return in the three-year average. Specifically, Mike contends that the court should have excluded (1) $245,651 in depreciation recapture and (2) $2,004,465 in capital gains from the sale of two grocery stores. While we agree with Mike that the depreciation recapture does not represent funds that he could have used to pay maintenance (see *In re Marriage of Johnson*, 245 Ill. App. 3d 816, 819 (1993) (recaptured depreciation "does not create additional value, only additional Federal income tax")), Mike cannot show that the inclusion of the recapture had any impact on court's maintenance award. Even subtracting out the depreciation recapture, Mike's average income would have been $1,224,292, still more than sufficient to warrant a $20,000 per month maintenance award. We also note, again, that Mike's income was just 1 of at least 14 statutory factors the court considered in determining maintenance. No one factor is determinative. *In re Marriage of Baskin*, 2012 IL App (2d) 110203, ¶ 10. Indeed, as Mike recognizes in countering

Dimitra's arguments, the law "does not require a maintenance award to be proportionate to [his] income" and "the record is clear that the trial court never intended [ ] that maintenance would be proportionate to [his] income." Thus, there is no evidence that the inclusion of the depreciation recapture affected the court's maintenance award.

¶ 49    Mike further argues that $2,004,465 of the capital gains he reported in 2013 should have been excluded from the court's average. According to Mike, those gains are "not reflective of what his future income or earning capacity would be" because they arose from the sale of two grocery stores, which are nonrecurring events because he no longer has an interest in them to sell. In support of his argument, he cites to only one case, *In re Marriage of Mayfield*, 2013 IL 114655. In *Mayfield,* our supreme court considered whether the circuit court erred by considering the husband's lump-sum workmen's compensation settlement in determining the amount of child support he owed. The court held that the circuit court properly considered the settlement, explaining that "a one-time payment is income, but its nonrecurring nature *may* factor into the trial court's decision on how to allocate it." (Emphasis added.) *Id.* ¶ 24; see also *In re Marriage of Pratt*, 2014 IL App (1st) 130645, ¶ 27. Nothing in *Mayfield* or the facts of this case compel the conclusion that the circuit court abused its discretion in considering the capital gains listed on Mike's 2013 tax return. We also note that, although Mike will obviously not be able to sell the specific grocery stores again, there is no reason to believe that he will not continue to realize capital gains in connection with his other businesses and investments. Mike's tax returns showed that he realized a capital gain or loss in every year since at least 2009, with significant gains of $722,034 in 2009 and $884, 226 in 2012. Moreover, Mike, who was in his 60s at the end of trial and intended to retire soon, still owned interests in at least 3 grocery stores and 27 rental properties. Mike is

therefore likely to continue to realize capital gains, and the circuit court did not abuse its discretion in considering the capital gain reported on his 2013 tax return.

¶ 50    Mike's final argument on cross-appeal is that the circuit court erred in allowing and crediting the testimony of Liakatas. According to Mike, the court should not have credited Liakatas' testimony because it was "evasive, impeached, inherently unbelievable and flawed." In support of his argument, he highlights several instances in which he says that Liakatas inflated the parties' income and lifestyle by attributing certain transfers in and out of their accounts to them even though those funds could not have been used to pay their expenses. However, it is clear from the record that Liakatas' testimony shaped the court's maintenance award only insofar as it established that Dimitra's monthly expenses exceeded $38,000. As Liakatas acknowledged at trial, she relied primarily on Dimitra's representations to determine her cash expenses. Although Mike also contends that Dimitra's account of her spending was excessive and unrealistic, the circuit court was in the best position to evaluate the credibility of the witnesses. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 69. Accordingly, we defer to the circuit court's finding that Dimitra's claimed expenses were credible. *Id.*

¶ 51                                        B. Niles Grand

¶ 52    Dimitra next argues that the circuit court erred in denying her claim of dissipation with respect to the sale of Niles Grand. Dimitra contends that the evidence adduced at trial and in her motions to re-open proofs showed that the sale was not a fair, arm's-length transaction, but was rather a "sham" to remove a valuable asset from the marital estate.

¶ 53    Dissipation occurs when one spouse uses marital property for his or her sole benefit while the marriage is undergoing an irreconcilable breakdown. *Stuhr*, 2013 IL App (1st) 152370, ¶ 65.

Whether conduct constitutes dissipation depends on the specific facts of a given case. *In re Marriage of Patel and Sines-Patel*, 2013 IL App (1st) 112571, ¶ 71. To prevail on a claim of dissipation, the party alleging dissipation must first establish a *prima facie* case that dissipation has occurred. *In re Marriage of Hamilton*, 2019 IL App (5th) 170295, ¶ 78. The party charged with dissipation then has the burden of showing, by clear and convincing evidence, that the funds in question were used for a legitimate marital purpose. *Id.* A circuit court's ruling on a claim of dissipation will not be reversed on appeal absent an abuse of discretion. *Evanoff*, 2016 IL App (1st) 150017, ¶ 37.

¶ 54    Here, the undisputed trial evidence showed that Mike used the proceeds from the sale of Niles Grand for marital purposes—he repaid an outstanding debt on one marital asset and injected the remaining funds into a different martial asset that was in need of capital. The arguments Dimitra advances on appeal as to why the sale was not an arm's-length transaction were all raised below and rejected by the circuit court. Although Dimitra contends that Marano, John, and Mike's explanations of the deal were not credible, it was the circuit court's role to determine the facts and resolve any inconsistencies in the testimony. We also find nothing inherently suspicious in the fact that Mike sold his interest in a closely-held family business to someone who had an extensive business relationship with the Svigos family.

¶ 55    Moreover, the only evidence that Mike sold his interest for less than it was worth was the testimony of Meinhart, who concluded that the fair market value of Mike's interest at the time of the sale was $2.89 million. However, the circuit court found that Meinhart was "not a credible witness." Instead, the court apparently credited Mike's testimony that the $1.5 million sale price was a "great deal," as he needed funds for other ventures and the store would begin to suffer due

to increased competition from larger stores opening in the area. We defer to the court's credibility findings.

¶ 56    To the extent Dimitra claims that Mike retained an interest in Niles Grand, we cannot say that the court abused its discretion in rejecting this theory. The uncontradicted testimony from Mike, Marano, and John established that Mike sold his interest outright. The written sales agreement was introduced into evidence. Mike's bank records and tax returns showed that Mike received the sale proceeds and thereafter did not receive any additional income from Niles Grand. At best, the fact that Mike's name still appeared on liquor license renewal applications after the sale created a conflict in the evidence. However, it is the role of the circuit court to evaluate the evidence and resolve any discrepancies therein. *In Marriage of Arjmand*, 2013 IL App (2d) 120639, ¶ 35. Accordingly, we decline to disturb the court's factual determinations that the sale both occurred and was a reasonable arm's-length transaction.

¶ 57                    C. Elaine Alexander and Longfellow

¶ 58    Dimitra further contends that the circuit court erred in finding that the transfers out of Elaine Alexander and Longfellow were not dissipation. Dimitra asserts that Mike failed to rebut her dissipation claims because the evidence showed that he did not "need" the money from those entities to pay his expenses. However, whether Mike "needed" the money is not the inquiry—the relevant question is whether the winding down of Elaine Alexander and Longfellow harmed the marital estate. See *In re Marriage of Miller*, 342 Ill. App. 3d 988, 994 (2003) ("The concept of dissipation is premised on waste. If a spouse's actions do not squander the martial estate's value, that spouse's actions cannot constitute dissipation.") Here, bank records and the testimony of Jason Wright, whom the circuit court found credible, traced all the distributions from Elaine Alexander

and Longfellow into Mike's personal accounts. Such tracing was sufficient to rebut Dimitra's claims of dissipation regarding the distributions.

¶ 59    Dimitra also challenges the payments that Elaine Alexander and Longfellow made to SAM in 2012. She contends that those transfers were actually not loan payments, but were disguised as such to remove value from the marital estate. However, Schierer, Wright, Paul, and John all explained that the transfers in question were repayments of funds that SAM lent to Elaine Alexander and Longfellow to purchase stocks. Although Dimitra questions why these loans went unpaid for many years, Paul testified that SAM never needed the money in the past but called the loans in order reconcile the accounts in light of Mike's divorce. We also note that Dimitra repeatedly asserts that the loans were undocumented. However, the loans were only "undocumented" in the sense that they were not evidenced by written promissory notes, which Scheirer testified was not unusual. Despite the lack of promissory notes, the loans were reflected on the balance sheets of the respective companies and were reported on Elaine Alexander and Longfellow's tax returns. Accordingly, the circuit court's finding that the transfers to SAM were loan payments and therefore not dissipation was not against the manifest weight of the evidence.

¶ 60                    D. Discovery Requests Relating to SAM

¶ 61    Dimitra next argues that the circuit court erroneously denied her discovery requests regarding SAM's tax returns. A circuit court has broad discretion in ruling on discovery matters, and its rulings will not be reversed on appeal absent an abuse of that discretion. *In re Marriage of Thornton*, 138 Ill. App. 3d 906, 913-14. The court abuses its discretion in discovery matters only when no reasonable person could agree with the court's decision. *Abramson v. Marderosian*, 2018 IL App (1st) 180081, ¶ 33.

¶ 62    Here, we cannot say that the trial court abused its discretion in denying Dimitra access to SAM's tax returns. Simply put, Dimitra provided no serious evidence that anyone other than Paul had an ownership interest in SAM. Contrary to Dimitra's claims on appeal, the evidence did not show that Mike had "deep ties" to SAM or that SAM served as Mike's "personal piggy bank." Rather, the evidence established that the relationship between SAM and Mike's businesses was limited to SAM managing the rental properties for a fee and SAM occasionally lending money to Elaine Alexander and Longfellow, which was always repaid with interest. This did not entitle Dimitra to further discovery from SAM.

¶ 63                    E. Dimitra's Motions to Re-Open Proofs

¶ 64    Nor did the circuit court err in denying Dimitra's third and fourth motions to re-open proofs regarding SAM. When ruling on a motion to re-open proofs, a circuit court must consider (1) whether the moving party provided a reasonable excuse for failing to submit the evidence during trial, (2) whether the admission of the evidence would result in unfair surprise or prejudice to the non-moving party, and (3) whether the evidence is of the utmost importance to the movant's case. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 55. A circuit court's denial of a motion to re-open proofs will not be reversed on appeal absent an abuse of the court's discretion. *Id.* ¶ 54.

¶ 65    Here, the documents Dimitra relies upon were all in existence before proofs closed in April 2016. Dimitra has never identified any reason why she could not have produced the documents sooner with due diligence. This alone is reason enough to justify the denial of her motion to re-open proofs. See *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1077 (2007) ("If evidence offered for the first time in a posttrial motion could have been produced at an earlier time, the court may deny its introduction into evidence.") (internal quotations omitted).

¶ 66    In any event, Dimitra cannot show that the documents were of the utmost importance to her case. The anomalous documents suggesting that SAM owned certain real estate do little to rebut the overwhelming evidence that SAM was simply a management company in which Mike had no interest. Indeed, Dimitra even recognized that, compared to the few pleadings on which she now relies, there were "tons of documents" that contradicted her position. Moreover, the anomalous documents were all explained as technical mistakes. These explanations were credited by the circuit court. Under these circumstances, we cannot say the court abused its discretion in denying Dimitra's motion to re-open proofs.

¶ 67                                  III. CONCLUSION

¶ 68    In sum, the circuit court did abuse its discretion to crafting the maintenance award. The court also properly denied Dimitra's claims of dissipation and her motions to re-open proofs. Accordingly, the judgment of the circuit court is affirmed.

¶ 69    Affirmed.